Filed 8/25/21  Prime Healthcare La Palma v. Kaiser Foundation Health Plan CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PRIME HEALTHCARE LA PALMA, LLC, et al., <br><br>                Appellants, <br><br>v. <br><br>KAISER FOUNDATION HEALTH PLAN, INC., et al., <br>                Respondents. | B296487 <br><br>(Los Angeles County Super. Ct. No. BC390969) <br>(JCCP No. 4580) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ann I. Jones, Judge.  Affirmed.

King & Spalding, Stephen L. Goff; Greines, Martin, Stein & Richland, Kent L. Richland, David E. Hackett; and A. Joel Richlin for Appellants.

Buchalter, Andrew H. Selesnick and Efrat M. Cogan for American College of Emergency Physicians, State Chapter of California, Inc. as Amicus Curiae on behalf of Appellants.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Joanna S. McCallum; Marion's Inn and Mark Palley for Respondents.

—————————————————

Prime Healthcare La Palma, LLC and related entities[1] (collectively Prime) sued Kaiser Foundation Health Plan, Inc. and affiliated entities[2] (collectively Kaiser) seeking additional payments for health care services Prime provided to Kaiser members. Kaiser, in turn, sought reimbursement for overpayments it had made to Prime. The parties agreed to arbitrate their dispute, which involved 47,000 individual claims from 2004 through 2014.

A panel of three arbitrators issued a multi-million dollar damage award in favor of Kaiser. The superior court denied Prime's petition to vacate the award, granted Kaiser's petition to confirm the award and entered judgment in favor of Kaiser.

Relying on the parties' agreement the arbitration award could be reviewed for legal error, Prime[3] appeals the judgment,

---

[1] The other Prime hospitals are Alvarado Hospital, LLC; Prime Healthcare Centinela, LLC; Veritas Health Services, Inc.; Desert Valley Hospital, Inc.; Prime Healthcare Services—Encino, LLC; Prime Healthcare Services—Garden Grove, LLC; Prime Healthcare Huntington Beach, LLC; Prime Healthcare Services III, LLC; Prime Healthcare Paradise Valley, LLC; Prime Healthcare Services—San Dimas, LLC; Prime Healthcare Services, II, LLC; and Prime Healthcare Anaheim, LLC.

[2] The other Kaiser parties are Kaiser Foundation Hospitals and Southern California Permanente Medical Group, Inc.

[3] The notice of appeal indicated Vanguard Health Systems, Inc.; Anaheim VHS Limited Partnership; Huntington Beach VHS Limited Partnership; and Vanguard Acquisition Partnership Number 2, LP (collectively Vanguard) and Prime Healthcare Services, Inc., as well as the Prime hospitals, appeal the superior court judgment. However, the parties' appellate briefs only identified the Prime hospitals as appellants.

contending the arbitration panel and the superior court committed reversible error in three distinct categories:

1. The panel and the superior court erred in ruling that Prime lacked standing to assert claims under California's unfair competition law and that it was proper for the arbitrators to decline to decide those claims on the merits.

2. The panel should have rejected Kaiser's claims to be reimbursed for overpayments as time-barred and voluntarily made.

3. The panel and the court erred in concluding the Prime parties' Medicare Advantage claims were subject to federal preemption and administrative exhaustion.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Parties and Litigation*

The Prime parties are a group of 13 Southern California acute care hospitals owned and operated by Prime Healthcare Services, Inc. The Kaiser parties form part of a not-for-profit organization that operates a "closed service model" under which its members generally receive health care from Kaiser or Kaiser-affiliated facilities but are sometimes treated at a non-Kaiser hospital, usually for emergency medical services.

Prime filed suit in state and federal court seeking reimbursement for Kaiser's alleged failure to pay, or adequately pay, for emergency and other health care services rendered by Prime to Kaiser health plan members at Prime's hospitals. The litigation commenced in January 2008 with the filing of five state court actions by several of the Prime hospitals against Kaiser. In July 2009 the Los Angeles Superior Court entered an order coordinating the five actions and an additional matter. In

November 2011 three of the Prime hospitals filed new actions against Kaiser in three different counties. In January 2012 those three cases were added to the original coordinated actions. In October 2013 all the actions were ordered consolidated for trial.

Prime's first consolidated complaint alleged Kaiser had engaged "in a long-running scheme to pressure emergency department physicians to transfer [Kaiser Foundation Health Plan, Inc.] members to Kaiser hospitals when they are not stable and safe for transfer, disrupt patient care in [Prime's] emergency departments and to withhold payment from [Prime] of amounts to which [Prime is] legally entitled for having rendered emergency medical services to [Kaiser Foundation Health Plan, Inc.] members."

Kaiser filed cross-complaints against Prime seeking relief for overpayments. Kaiser's third amended cross-complaint asserted categories of overpayment damages that included payments made at rates exceeding the reasonable value of Prime's services and improper billings.

2. *The Arbitration Agreement*

On February 7, 2015 the parties settled a substantial portion of their dispute and agreed to arbitrate their remaining claims. The arbitration agreement, under the heading "Scope of Arbitration," stated the parties agreed to "binding arbitration . . . in lieu of litigation in any court" of the consolidated Los Angeles Superior Court proceeding, "including, without limitation, Prime's Medicare Advantage Claims and Kaiser's Medicare Advantage cross-claims"; a related case filed by Prime addressing 2013-2014 claims; and "any and all cross-claims Kaiser wishes to advance in response" to Prime's 2013-2014 claims. Kaiser also

agreed to dismiss its common law fraud cause of action, and Prime agreed to dismiss a federal lawsuit.

In a separate section, under the subheading "Disputes Concerning Scope," the arbitration agreement provided, "In the event of a dispute between the Parties concerning the scope of arbitration, the Arbitrators shall decide, in the exercise of sound discretion, the dispute."

Under the heading "Decision and Final Award," the arbitration agreement provided, "The Arbitrators shall have the power to grant all legal and equitable remedies available to the Parties under California law, including, but not limited to, preliminary and permanent private injunctions, specific performance, reformation, cancellation, accounting, and compensatory damages, at the Arbitrators' discretion. The Arbitrators shall not be empowered to make mistakes of law or legal reasoning." Under that same heading the agreement further provided, "The Final Award shall be conclusive and binding and may be confirmed thereafter as a judgment by the Superior Court of the State of California, subject only to challenge on the grounds set forth in California Code of Civil Procedure Section 1285 et seq. or on the grounds that the Arbitrators exceeded his/her/their powers by making a mistake of law or legal reasoning. The Parties agree that the court shall have jurisdiction to review, and shall review, all challenged findings of law and legal reasoning based on a *de novo* review."

The arbitration agreement also provided, as to the Medicare Advantage claims, "[T]he arbitrators will be empowered to determine whether those claims should be dismissed based on federal preemption and/or exhaustion of administrative remedies, and that the agreement to arbitrate does not waive or alter any

5

such defenses and arguments that the parties would have had in the federal or state courts."

### 3. *The Arbitration and Final Award*

The arbitration proceeded before a panel of three arbitrators in nine phases (including a damages phase) over a three-year period, with awards following each phase. The panel heard 67 days of live testimony and argument and issued several partial final awards and interim awards, which were summarized in, and attached as appendices to, the final arbitration award.

On May 1, 2017 the panel issued a tentative decision. The parties submitted objections, and in June 2017 the panel issued an order on the objections to the tentative decision.

On March 19, 2018, determining both Kaiser and Prime were entitled to a damages award, with Kaiser's amount exceeding Prime's, the panel issued a final arbitration award entitling Kaiser to a net multi-million dollar recovery against Prime and identifying the Kaiser parties as the prevailing parties.[4]

---

[4] Specifically, the panel determined Kaiser Foundation Health Plan, Inc. was entitled to an award against Prime Healthcare Services, Inc. and the Prime hospitals on some claims or causes of action and against Prime Healthcare Services, Inc., several of the Prime hospitals and Vanguard on other claims or causes of action. The panel also determined Prime Healthcare Services, Inc. and the Prime hospitals were entitled to an award against Kaiser Foundation Health Plan, Inc. on certain claims or causes of action. Kaiser Foundation Hospitals and Southern California Permanente Medical Group, Inc. were dismissed with prejudice. The Medicare Advantage claims were dismissed for lack of jurisdiction.

6

4. *The Petitions To Confirm and To Vacate the Arbitration Award and the Superior Court's Order and Judgment*

Kaiser petitioned in the consolidated and coordinated superior court action to confirm the arbitration award, and Prime petitioned to vacate it.[5] After hearing argument, the superior court on February 11, 2019 issued an order granting Kaiser's petition and denying Prime's. On February 26, 2019 the superior court entered a judgment confirming the final arbitration award.

## DISCUSSION

1. *Grounds for Vacating an Arbitration Award and Standard of Review*

When parties agree to private arbitration, the scope of judicial review is strictly limited to give effect to the parties' intent to bypass the judicial system and thereby avoid potential delays at the trial and appellate levels. (E.g., *Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 916; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 10; *Branches Neighborhood Corp. v. CalAtlantic Group, Inc.* (2018) 26 Cal.App.5th 743, 750.) The exclusive grounds on which a court may vacate an arbitration award are identified in Code of Civil Procedure section 1286.2, which include, in subdivision (a)(4), the arbitrator exceeded his or her powers. (See *Richey*, at p. 916 ["courts are authorized to

---

[5] The petition to vacate the final arbitration award was filed using a Judicial Council of California form that requests the name of each petitioner. Prime Healthcare Services, Inc., unlike the Prime hospitals, was not named as a petitioner seeking to vacate the award. In a separate request for judicial notice filed in support of their petition to vacate, the Prime hospitals stated the petition to vacate was filed only by "Prime Healthcare La Palma, LLC, and the other petitioner-hospitals."

7

vacate an award if it was (1) procured by corruption, fraud, or undue means; (2) issued by a corrupt arbitrator; (3) affected by prejudicial misconduct on the part of the arbitrator; or (4) in excess of the arbitrator's powers"].)

Generally, "'[a]rbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity,'" and a court may not review the merits of the controversy between the parties, the validity of the arbitrator's reasoning or the sufficiency of the evidence supporting the arbitration award. (*Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at pp. 10-11.) However, "'[a]n exception to the general rule assigning broad powers to the arbitrators arises when the parties have, in either the contract or an agreed submission to arbitration, explicitly and unambiguously limited those powers. [Citation.] "The powers of an arbitrator derive from, and are limited by, the agreement to arbitrate. [Citation.] Awards in excess of those powers may . . . be corrected or vacated by the court."'" (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1356; see *id.* at p. 1355 ["[i]f the parties constrain the arbitrators' authority by requiring a dispute to be decided according to the rule of law, *and* make plain their intention that the award is reviewable for legal error, the general rule of limited review has been displaced by the parties' agreement"].)

We review de novo a superior court's judgment confirming an arbitration award, including a determination whether the arbitrator exceeded his or her powers in granting relief. (*Richey v. AutoNation, Inc.*, *supra*, 60 Cal.4th at p. 918, fn. 1; *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9;

*VVA-TWO, LLC v. Impact Development Group, LLC* (2020)
48 Cal.App.5th 985, 998.)

We also review de novo questions of statutory construction. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.)  "Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose.  [Citation.]  We consider first the words of a statute, as the most reliable indicator of legislative intent.'"  (*Ibid*.)  The words of the statute are to be given "'their usual and ordinary meaning.'"  (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 387.)

"'Rules governing the interpretation of statutes also apply to interpretation of regulations.  [Citation.]  "In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage.'""  (*In re Villa* (2013) 214 Cal.App.4th 954, 964; see *In re Cabrera* (2012) 55 Cal.4th 683, 688 ['"we defer to an agency's interpretation of its own regulations, particularly when the interpretation implicates areas of the agency's expertise'"]; *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 490 ["[a]s a general matter, courts will be deferential to government agency interpretations of their own regulations, particularly when the interpretation involves matters within the agency's expertise and does not plainly conflict with a statutory mandate"].)

2. *Prime Was Not Prejudiced by the Arbitrators' Ruling Regarding UCL Standing*

   a. *Procedural background*

      i. *The first consolidated complaint's allegations*

In the first consolidated complaint Prime alleged the federal Emergency Medical Treatment and Active Labor Act of 1986 (EMTALA) (42 U.S.C. § 1395dd) and California's Health and Safety Code section 1317[6] et seq. prohibit providers such as the Prime hospitals from discharging or transferring patients who arrive with an emergency medical condition until the hospital provides emergency medical services to the patient, regardless of his or her insurance or financial status, and Kaiser is legally required to reimburse providers for providing such services to its members. Based on this premise, Prime asserted a cause of action against Kaiser under California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) for a variety of alleged unlawful business practices, including underpayment of claims for emergency medical services by using a flawed methodology for calculating those services' reasonable and customary value. On its UCL claims Prime sought a monetary recovery it characterized as restitution, interest and an order permanently enjoining Kaiser parties engaging in the alleged unlawful acts and practices.

      ii. *The arbitration's reasonable and customary methodology phase*

The arbitration panel heard as a discrete phase the issue of the methodology used by Kaiser to determine and pay the

---

[6] Statutory references are to the Health and Safety Code except where otherwise stated.

10

reasonable and customary value of the emergency health care services provided by Prime hospitals as non-contracted providers pursuant to California Code of Regulations, title 28, section 1300.71, subdivision (a)(3)(B) (regulation 1300.71(a)(3)(B)).[7] The evidentiary hearing occurred over three days in November 2015.

On March 10, 2016 the panel issued a partial final award for the reasonable and customary methodology phase.[8] In the factual background the panel described the statutory and regulatory context of the issue, relying in part on responses by the Department of Managed Health Care (Department) to public comments to proposed regulation 1300.71(a)(3)(B) and the Department's final statement of reasons for promulgating regulation 1300.71 on July 25, 2003. The panel explained section 1371.4 requires health plans to reimburse providers for emergency services until the care results in the stabilization of the plan's enrollee and section 1371.35, subdivision (a), requires health maintenance organizations to reimburse undisputed completed claims within 45 days. Regulation 1300.71(a)(3)(B) implements sections 1371.4 and 1371.35 by defining how to timely reimburse non-contracted claims: Plans can pay the reasonable and customary value of the provided health care services by adopting a reasonable and customary methodology that "uses 'statistically credible information that is updated at least annually' and that 'takes into consideration' the six factors

_____

[7] References to a regulation are to section 1300.71 (and its subdivisions) of title 28 of the California Code of Regulations unless otherwise stated.

[8] The award was attached as Appendix E to, and summarized in, the March 19, 2018 final arbitration award.

outlined in a worker's compensation case, *Gould v. WCAB* [1992] 4 Cal.App.4th 1059, 1071 [(*Gould*)]." Quoting regulation 1300.71(a)(3)(B), the panel stated those six factors are "(i) [t]he provider's training, qualification[s], and length of time in practice; (ii) the nature of the services provided; (iii) the fees usually charged by the provider; (iv) prevailing provider rates charged in the general geographic area in which the services were rendered; (v) other aspects of the economics of the medical provider's practice that are relevant; and (vi) any unusual circumstances in the case."

As articulated by the panel, Prime claimed Kaiser's reasonable and customary methodology was not compliant with regulation 1300.71(a)(3)(B) and Kaiser should pay Prime's undiscounted billed charges and 15 percent statutory interest on the underpaid sums. Kaiser contended Prime lacked standing to assert a direct action for a determination regarding the components of its reasonable and customary methodology; the panel should abstain from making that determination because the Department had jurisdiction over the reasonable and customary methodology issue; Prime could not use the UCL to litigate the issue; the Department had already reviewed Kaiser's methodology and allowed it; and the methodology complied with all of regulation 1300.71(a)(3)(B)'s criteria, resulting in Kaiser having already paid fair market value for Prime's services.

The panel ruled Prime lacked standing to challenge Kaiser's reasonable and customary methodology and, even if Prime had standing, it was appropriate for it to abstain from ruling on that challenge. The panel explained, although Prime claimed Kaiser's noncompliance with regulation 1300.71(a)(3)(B) constituted the requisite unlawful act, the regulation merely

12

"contains 'generally worded criteria' which appear to be guidelines for discretionary review which is in the province of the [Department]." While the Department requires that plans "shall 'take into consideration,' the *Gould* factors," the Department provides discretion for plans in designing their reasonable and customary methodology; thus, there was "no single way" for a plan to design that methodology, and "it [was] for the [Department] to exercise its discretion in reviewing and monitoring plans' [reasonable and customary methodology]." Quoting a July 24, 2012 Alameda County Superior Court decision (*Cal. Pacific Medical Center v. Kaiser Foundation Health Plan* (Super. Ct. Alameda County, No. RG0842608), the panel concluded regulation 1300.71(a)(3)(B) "contains generally worded criteria, but does not define what is lawful or unlawful." (Emphasis in bold omitted.)

The panel also observed the Department, in an amicus brief in another matter,[9] had stated, "'Sections that are "purely regulatory" in nature are within the exclusive jurisdiction of the [Department] to enforce, for they require the exercise of discretion.'"[10] The arbitrators essentially concluded Prime's

---

[9]     The panel quoted from the Department's amicus brief dated March 17, 2005 in *Bell v. Blue Cross of California*, Second District Court of Appeal, Division One, No. B174131 (arbitration exhibit RCRV0395, which was also filed in superior court as Prime's exhibit PHS57 in connection with the petitions to confirm and vacate the arbitration award). Prime has asked this court to take judicial notice of various documents, including the Department's March 17, 2005 amicus brief in *Bell v. Blue Cross of California*. We grant that motion, which was unopposed.

[10]     The panel also quoted *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301-1302: "[T]he courts

challenge to Kaiser's reasonable and customary methodology constituted an attack on an improper payment pattern or practice, requiring a discretionary determination within the Department's exclusive jurisdiction.

Although the panel concluded Prime did not have standing to litigate Kaiser's reasonable and customary methodology in its UCL claim, the panel noted that Prime was pursuing in another phase of the arbitration quantum meruit claims for the reasonable value of emergency services rendered to Kaiser's enrollees. The panel clarified the scope of its ruling on standing: "To the extent that any UCL action seeks restitution . . . , such action is subsumed in that reasonable value phase based on quantum meruit. For the reasons set forth herein, however, and to the extent that Prime is seeking also to enjoin Kaiser under the UCL from its alleged non-compliance with [regulation] 1300.71 [and sections] 1371.4[] and 1371.35, Prime may not do so."

iii. *The arbitration's reasonable value phase*

The evidentiary hearing for the reasonable value phase was conducted over eight days in July 2015 and an additional day in November 2016. As explained by the panel, the issue to be determined was the reasonable value of emergency services

---

cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing Business and Professions Code section 17200. [Citation.] To the extent that the order on appeal is based on portions of the Knox-Keene Act having a purely regulatory import, it improperly invades the powers that the Legislature entrusted to the Department of Corporations," which the panel described as the Department's predecessor.

provided by Prime hospitals to Kaiser members who received such services at a Prime hospital when the members lacked the option, or chose not, to go to a Kaiser hospital and when no contract existed between Prime and Kaiser governing the prices for the services. Kaiser reimbursed Prime using various methodologies, and on certain occasions Kaiser's payments averaged between 80 and 90 percent of Prime's full billed charges. Prime sought additional reimbursement amounts equal to 100 percent of its full billed charges, which it asserted constituted reasonable value.

The parties offered documentary evidence and called witnesses, including expert witnesses. Prime's model was "based upon a single metric": what Kaiser paid for emergency services "to the most comparable hospitals under the most closely comparable terms." Kaiser's model was "based upon a broader range of three market metrics," including what Prime hospitals accepted for emergency services from other commercial payors.

On May 1, 2017 the panel issued a partial final award on the reasonable value phase.[11] According to the panel, the parties agreed *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260 (*Children's Hospital*) "provides the legal framework for the analysis of reasonable value." The panel stated, "As relevant here, the Court of Appeal in *Children's Hospital* held that the six *Gould* factors set forth in [regulation] 1300.71(a)(3)(B) are not the exclusive measure of valuing the services provided by a non-contracted provider who provided post-stabilization emergency services that were

---

[11]     This award was attached as Appendix F to, and summarized in, the 2018 final arbitration award.

15

rendered to Medi-Cal beneficiaries. Rather those factors are the *minimum* criteria for reimbursement of a claim, not the *exclusive* criteria. . . . [¶] . . . [¶] . . . The teaching of *Children's Hospital* is that reasonable value is to be determined by all relevant economic factors as listed above and is not to be restricted to the *Gould* factors or to any single economic metric. [¶] Accordingly, Prime is entitled to the reasonable value of its services, determined in accordance with the *quantum meruit* criteria enunciated in *Children's Hospital*."

The panel adopted the reasonable value calculations of Kaiser's expert witnesses because "they were both more legally accurate and more analytically persuasive" and "Kaiser's model more accurately applied the teachings of *Children's Hospital*." Moreover, "Kaiser's model analyzed market data for multiple years whereas Prime's experts picked only one year and a single metric." The panel identified several "analytic problems with Prime's model," including "Prime selected only a single year, 2012, for comparisons, a year that represented the highest single level of Kaiser's payments to other hospitals." The panel concluded that "Kaiser's approach with its more comprehensive data set is the appropriate approach under [*Children's Hospital*'s] direction that the scope of the rates accepted by or paid to a hospital by other payors is the primary and most reliable indicator of the value of the services in the marketplace."

iv. *The arbitration's damages phase*

The damages phase of the arbitration was conducted in December 2016 and January 2017, with closing argument in February 2017. Among the issues to be determined in this phase was whether Kaiser had a right to recover overpayments, including any Kaiser payments made to Prime at rates that

16

exceeded the reasonable value of Prime's services as determined using the method or rate the panel had deemed appropriate in the prior reasonable value phase. The panel also determined the amount of damages, if any, to which Prime was entitled on its claims. The panel in its final arbitration award ruled Kaiser had paid amounts exceeding the reasonable value of Prime's emergency health care services and was entitled to recover against Prime.

v. *The superior court's order on the petitions to confirm and to vacate the final arbitration award relating to the reasonable and customary phase*

The superior court agreed that Prime lacked standing to challenge Kaiser's reasonable and customary methodology, ruling, "Prime is not seeking to enjoin any act that has been declared unlawful." Regulation 1300.71(a)(3)(B), the court explained, "does not declare any unlawful act that may be enjoined through the UCL," providing only generally worded criteria for determining reasonable and customary value.[12] After pointing out that the panel had concluded Prime's UCL restitution claim was "'subsumed in th[e] reasonable value phase based on quantum meruit,'" the court ruled Prime had forfeited its counter-argument that it was entitled to its full billed charges plus 15 percent interest as restitution by failing to assert this theory during the arbitration proceedings. Even in the absence of forfeiture, the court continued, the additional relief sought by Prime "would not restore the status quo, and instead, would award Prime a non-restitutionary penalty." Moreover, 15 percent

---

[12] The superior court also agreed with the panel that abstention was, in any event, appropriate.

17

interest under sections 1371 and 1371.5 "applies to untimely reimbursement of uncontested claims." The panel here had found that "'all the claims for which Prime seeks additional reimbursement . . . were contested.'"

As for the reasonable value phase, the superior court concluded the panel's rejection of Prime's model and acceptance of Kaiser's model for calculating reasonable value did not constitute legal error and was within its discretion. The court also stated the panel's "factual findings regarding the unreliability of Prime's model are not reviewable under the limited scope of judicial review agreed upon by the parties in their Post Dispute Arbitration Agreement." (Fn. omitted.) With respect to the arbitration's damages phase, the court rejected Prime's arguments that the panel had erred in ruling Kaiser's cross-claims for overpayment were not barred.

b. *The UCL*

Unfair competition under the UCL includes "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) Written in the disjunctive, Business and Professions Code section 17200 establishes "three varieties of unfair competition—acts or practices which are unlawful, unfair, or fraudulent." (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180; accord, *Abbott Laboratories v. Superior Court of Orange County* (2020) 9 Cal.5th 642, 651; *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.)

The "unlawful" prong of the UCL "'borrows' violations from other laws by making them independently actionable as unfair competitive practices." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143; accord, *Kasky v. Nike, supra,* 27 Cal.4th at p. 949.) The "unfair" prong authorizes a

18

cause of action under the UCL if the plaintiff can demonstrate the objectionable act, while not unlawful, is "unfair" within the meaning of the UCL.  (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 182.)  Under the "fraudulent" prong, a business practice violates the UCL if it "'is likely to deceive the public.'"  (*Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 876; accord, *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1380.)

### i.  *UCL standing*

"'Historically, the UCL authorized any person acting for the interests of the general public to sue for relief notwithstanding any lack of injury or damages.  [Citation.]  At the November 2, 2004, General Election, the voters approved Proposition 64, which amended the UCL to provide that a private person has standing to bring a UCL action only if he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition."' . . . [¶] . . . To satisfy Proposition 64 a plaintiff 'must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice . . . that is the gravamen of the claim.'"  (*Sarun v. Dignity Health* (2014) 232 Cal.App.4th 1159, 1166; accord, *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322.)

### ii.  *UCL restitution*

"To achieve its goal of deterring unfair business practices in an expeditious manner, the Legislature limited the scope of the remedies available under the UCL.  'A UCL action is equitable in nature; damages cannot be recovered.'"  (*In re Tobacco II Cases*

(2009) 46 Cal.4th 298, 312; see *Korea Supply Co. v. Lockheed Martin Corp., supra*, 29 Cal.4th at p. 1150 [damages are not available under the UCL].) "Injunctions are 'the primary form of relief available under the UCL to protect consumers from unfair business practices,' while restitution is a type of 'ancillary relief.'" (*Kwikset Corp. v. Superior Court, supra*, 51 Cal.4th at p. 337.) Restitution is available "to restore to any person in interest any money or property . . . which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203; see *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1303 ["'[t]hrough the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices'"]; see *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 790.)

Restitution under the UCL must be restorative in nature: "'Restitution under [Business and Professions Code] section 17203 is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.' [Citation.] '[C]ompensatory damages are not recoverable as restitution.'" (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 371; accord, *Korea Supply Co. v. Lockheed Martin Corp., supra*, 29 Cal.4th at p. 1149 [the "object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest"]; see *In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 131 ["[t]he difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution"]; *Madrid v. Perot Systems Corp.*

(2005) 130 Cal.App.4th 440, 453 ["in the context of the UCL, 'restitution' is limited to the return of property or funds in which plaintiff has an ownership interest (or is claiming through someone with an ownership interest)"]; see also *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 174 [defining restitution as "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received"].)

### c. *The Knox-Keene Act*

"Health care service plans are governed by the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act or Act). ([§ 1340 et seq.].) The Knox-Keene Act 'is "a comprehensive system of licensing and regulation" [citation], formerly under the jurisdiction of the Department of Corporations . . . and presently within the jurisdiction of the Department of Managed Health Care.'" (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1004-1005.) "[T]he Knox-Keene Act 'compels for-profit health care service plans to reimburse emergency health care providers for emergency services to the plans' enrollees.'" (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 504.)

The Department "has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business." (§ 1341.) The director of the Department is authorized to adopt rules necessary to implement the provisions of the Knox-Keene Act, including rules "defining any terms, whether or not used in [the Act], insofar as the definitions are not inconsistent with the provisions of [the Act]." (§§ 1340, 1344.) The director may also "waive any requirement of

21

any rule . . . in any situations where in the director's discretion that requirement is not necessary in the public interest or for the protection of the public, subscribers, enrollees, or persons or plans subject to [the Act]." (§ 1344, subd. (a).)

### d. *Prime's UCL restitution claim*

#### i. *Reasonable value*

Prime has abandoned its claim for injunctive relief under the UCL, asserting on appeal only that the judgment confirming the arbitration award should be reversed because the panel and superior court erred in ruling Prime could not recover a restitution award for underpayment for its services based on its lack of standing, as a provider, to enforce statutory and regulatory reimbursement rules. Prime's argument misperceives (or mischaracterizes) the panel's decision. As discussed, the panel determined Prime lacked standing to assert its UCL claim for injunctive relief for Kaiser's allegedly improper reasonable and customary methodology. The record reflects, however, the panel determined Prime's UCL restitution claim on the merits, as the panel indicated it would do. In the reasonable value phase and the subsequent damages phase, the panel concluded Kaiser had made payments exceeding the reasonable value of Prime's emergency health care services, thereby determining Prime was not entitled to recover, whether as damages or some form of restitution properly considered under the UCL, for any alleged failure of Kaiser's reasonable and customary methodology to comply with the Knox-Keene Act.[13]

---

[13] The parties agree, and the damages award shows, the panel determined Kaiser had paid amounts exceeding the reasonable value of Prime's emergency health care services. The

22

Prime expressly addressed the panel's approach to the merits of its UCL restitution claim during the arbitration proceedings. Prior to issuing its March 19, 2018 final arbitration award, the panel issued its May 1, 2017 tentative decision, which summarized its determination regarding the reasonable and customary methodology issue in nearly identical language as its discussion of the issue in the final award. Prime objected to the tentative decision, stating, in part, the panel erred in concluding that "Prime's UCL claim [was] subsumed in its *quantum meruit* claim" because "*Bell* [*v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 214] held that a provider may assert both claims, . . . so the Tentative errs in eliminating Prime's UCL claim on that basis." In its June 8, 2017 order on the parties' objections to its tentative decision, the panel responded to Prime's objection: "Prime misses the point. The Panel did not find that the UCL claims by either Prime or Kaiser were improperly pleaded. The Panel found as a factual matter that neither party had proven by a preponderance of the evidence a case of unfair business practices. The Panel continues to believe that finding was correct." Rather than "eliminating" Prime's UCL claim based solely on lack of standing or abstention, the

panel's statements in the final arbitration award regarding the repricing of payments indicate the panel determined Kaiser's payments made under its reasonable and customary methodology exceeded Prime's services' reasonable value: For example, unpersuaded by Prime's argument that Kaiser may not reject the rate paid under its reasonable and customary methodology to "pay at a lower reasonable value rate," the panel concluded, "Kaiser is entitled to the difference between the [reasonable and customary] amounts it paid Prime and the reasonable value rates that this Panel determined."

panel thus confirmed it had denied the UCL restitution claim on the merits.

Prime does not challenge on appeal the panel's reasonable value determination, including its finding that Prime's full billed charges did not reflect the reasonable value of Prime's services. Yet, notwithstanding the panel's conclusion Kaiser had paid amounts exceeding the reasonable value of Prime's services, Prime contends the panel committed reversible error because it failed to determine whether the reasonable and customary methodology Kaiser used to pay Prime complied with regulation 1300.71(a)(3)(B). Prime argues the panel's decision "did not discuss the *Gould* factors," "did not analyze what amounts Kaiser would have paid over if its methodology had been statistically updated annually, as Regulation 1300.71 requires," and "[t]here was never a *finding* about what payments a compliant [reasonable and customary] methodology would have yielded."

Although Prime now argues it is entitled to restitution, calculated as the difference between the amount that should have been paid using a methodology compliant with regulation 1300.71(a)(3)(B) and the amount Kaiser actually paid under its noncompliant methodology, during the arbitration Prime for its UCL claim sought the difference between its full billed charges, which it contended constituted reasonable value, and the payments Kaiser actually made. Prime's theory on appeal of a different measure of restitution is forfeited. (See *Comerica Bank v. Howsam* (2012) 208 Cal.App.4th 790, 829 ["[i]n order to challenge an award in court, a litigant must have raised the point before the arbitrator"]; see also *Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at p. 30 ["[t]he issue would have been

waived, however, had Moncharsh failed to raise it *before the arbitrator*"].)[14]

Even if Prime's new restitution theory were not forfeited, however, Prime has failed to show it is entitled to "reasonable and customary value" payments that exceed the reasonable value of the services rendered by Prime hospitals. (Cf. *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group*,

---

[14] In its objections to the tentative decision Prime stated, "[T]he restitution remedy is a refund of the discounts Kaiser took under its unlawful [reasonable and customary m]ethodology, and 15% statutory interest." Similarly, in its closing brief for the reasonable and customary methodology phase, Prime argued Kaiser "should be obligated to pay Prime's undiscounted billed charges" and "15% interest on all sums the Panel finds due and owing on the claim, until the date of payment." Although Prime stated, "Kaiser could agree to the amounts charged, or pay using [a reasonable and customary methodology] that complied with the regulation," it continued, "Since Kaiser did not comply with the regulation, it must be deemed to have chosen its option to pay Prime's undiscounted charges." Prime did not contend it sought the difference between an amount Kaiser should have paid using a compliant methodology and payments Kaiser already made. Prime has also cited to nothing in the record showing the panel had precluded it from introducing evidence of the *Gould* factors in the reasonable value phase.

To be sure, Prime argued and presented evidence in the arbitration proceedings that Kaiser's methodology was noncompliant. But it has identified nothing in the record reflecting any evidence of the amount it contended a compliant methodology would have yielded or that such amount exceeded what Kaiser paid, even though, as plaintiff, Prime had the burden of proof. Nor do the Prime parties on appeal assert what that amount should be.

*supra*, 45 Cal.4th at p. 508 ["emergency room doctors do not have unfettered discretion to charge whatever they choose for emergency services"; "although emergency room doctors 'are entitled to "reasonable" compensation for the services rendered, they cannot lawfully seek unreasonable payment from anyone'"].) Regulation 1300.71(a)(3)(B) provides no support for Prime's argument Kaiser was obligated to pay amounts above reasonable value. As Prime explains, Kaiser is required by statute to reimburse Prime for emergency services provided by the Prime hospitals (see §§ 1371.4,[15] 1371.35[16]), and regulation 1300.71(a)(3)(B) defines reimbursement of a claim as payment of the "reasonable and customary value for the health care services rendered based upon statistically credible information that is updated at least annually and takes into consideration" the six *Gould* factors. However, the regulation does not specify a mathematically defined formula, instead requiring a value calculation that considers, but need not necessarily incorporate, the identified factors. Given that one of

---

[15]    Section 1371.4, subdivision (b), provides, "A health care service plan . . . shall reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee," subject to an exception that is not at issue in this appeal.

[16]    Section 1371.35, subdivision (a), provides in part, "A health care service plan . . . shall reimburse each complete claim, or portion thereof, whether in state or out of state, as soon as practical, but no later than 30 working days after receipt of the complete claim by the health care service plan, or if the health care service plan is a health maintenance organization, 45 working days after receipt of the complete claim by the health care service plan."

26

the factors is "any unusual circumstances in the case," the criteria identified in the regulation are necessarily nonexclusive. (See *Prospect Medical Group, Inc. v. Northridge Emergency Medical Group*, *supra,* 45 Cal.4th at p. 505 ["But how this amount [the reasonable and customary amount under regulation 1300.71(a)(3)(B)] is determined can create obvious difficulties.  In a given case, a reasonable amount might be the bill the doctor submits, or the amount the HMO chooses to pay, or some amount in between"].)

The elastic nature of the regulation's definition of reasonable and customary value was confirmed by the Department, as discussed in *Children's Hospital*, *supra*, 226 Cal.App.4th at pages 1272 through 1274.  *Children's Hospital* involved a dispute over the reasonable value of poststabilization emergency medical services between Blue Cross and the hospital that provided those services to enrollees of Blue Cross's Medi-Cal managed care plan.  The hospital sought its full billed charges, which it had argued constituted the "reasonable and customary value" of its services under regulation 1300.71(a)(3)(B).  At trial the hospital applied the regulation's six-factor test to its billed charges, introducing, for example, testimony regarding the hospital's qualifications, training and experience.  The jury awarded the hospital the difference between the amount of those charges and the amount Blue Cross had paid.  Blue Cross appealed, arguing the trial court had improperly excluded certain of Blue Cross's evidence based on the court's erroneous conclusion regulation 1300.71(a)(3)(B) provided the exclusive standard for determining the reasonable and customary value of the services. The Fifth District agreed and reversed the judgment.  (*Children's Hospital*, at pp. 1264-1265.)

The court of appeal explained the Department had defined "'reasonable and customary value'" by incorporating language from *Gould*, *supra*, 4 Cal.App.4th 1059, which concluded the Workers' Compensation Appeals Board, in deciding the reasonableness of certain psychotherapy session fees, "'*may* consider evidence regarding'" the same six factors later incorporated into regulation 1300.71(a)(3)(B). (*Children's Hospital*, *supra*, 226 Cal.App.4th at pp. 1271-1272.) After summarizing the Department's responses to public comments in connection with regulation 1300.71's adoption and the Department's final statement of reasons for promulgating the regulation, the court of appeal stated, "In sum, in adopting [regulation] 1300.71(a)(3)(B), the [Department] established the minimum criteria for reimbursement of a claim, not the exclusive criteria. The [Department] refused to set specific amounts noting that neither billed charges nor government rates are determinative of the reasonable value of the medical services. Rather, the [Department] intended that reasonable value be based on the concept of quantum meruit and that value disputes be resolved by the courts." (*Children's Hospital*, at pp. 1272-1273.) The court of appeal continued, "As recognized by the [Department], [regulation] 1300.71(a)(3)(B)'s directive to pay noncontracted providers the reasonable and customary value of their services embodies the concept of quantum meruit," the measure of recovery of which "is the reasonable value of the services, provided they were of direct benefit to the defendant." (*Id*. at p. 1274.) Further, "while the *Gould* court set forth a comprehensive set of factors for the situation presented there, those factors are not exclusive or necessarily appropriate in all cases"; and, although the hospital was required to demonstrate

28

reasonable value, such value was "not ascertainable from [the hospital's] full billed charges alone." (*Id*. at p. 1275.) The court of appeal concluded, "Therefore, the trial court erred in ruling that [regulation] 1300.71(a)(3)(B) provided the exclusive standard for determining the reasonable value of the poststabilization services. The [Department] neither intended nor had the power to dictate payment rates or change California law on quantum meruit." (*Id*. at p. 1276.)

In the arbitration Prime disputed this analysis, arguing, because providers always had the ability to sue for reasonable value by bringing a common law cause of action for quantum meruit, there would have been no purpose in promulgating regulation 1300.71(a)(3)(B) if interpreted to allow a payor like Kaiser to avoid liability for using a noncompliant methodology to calculate a reimbursement amount by instead paying reasonable value applying common law principles. However, as explained by the court in *Children's Hospital*, sections 1371 and 1371.35 "impose procedural requirements on claim processing and subject health care service plans to disciplinary action and penalties for failure to timely comply with those requirements." (*Children's Hospital*, *supra*, 226 Cal.App.4th at p. 1271.) Regulation 1300.71(a)(3)(B) was intended to clearly define terms relating to claim settlement and reimbursement and to provide procedures for plans and providers to prevent unreasonable delays in payment of provider claims. As such, "the 'regulations are intended to set forth the *minimum* payment criteria to ensure compliance with the [Knox-Keene] Act's claims payment and dispute resolution standards.'" (*Children's Hospital*, at pp. 1271, 1273.)

In sum, regulation 1300.71(a)(3)(B), with its "reasonable and customary value" criteria, permits a payor to comply with the prompt-pay timing provisions of the Knox-Keene Act and avoid potential action by the Department by paying a noncontracted provider's claim for emergency services using a simple, truncated method (the "'*minimum* payment criteria'") for calculating reasonable value. Nevertheless, regulation 1300.71(a)(3)(B), intended by the Department to provide for reimbursement of reasonable value, does not foreclose a dispute between the provider and payor regarding the calculated amount to be resolved in a forum allowing for a more comprehensive reasonable value inquiry applying traditional quantum meruit principles. The regulation was neither intended nor should be construed to require a payor to pay more than reasonable value.

ii. *Statutory interest*

Prime also argues on appeal the panel's consideration of Prime's UCL restitution claim as part of the panel's reasonable value analysis was prejudicial because the panel thereby prevented Prime from recovering the statutory 15 percent interest to which it was entitled pursuant to sections 1371[17] and 1371.35, subdivision (b),[18] on all funds Kaiser owed, but failed to

---

[17] Section 1371, subdivision (a)(2), provides, in part, "If an uncontested claim is not reimbursed by delivery to the claimants' address of record within the respective 30 or 45 working days after receipt, interest shall accrue at the rate of 15 percent per annum beginning with the first calendar day after the 30- or 45-working-day period."

[18] Section 1371.35, subdivision (b), provides, in part, "If a complete claim, or portion thereof, that is neither contested nor denied, is not reimbursed by delivery to the claimant's address of record within the respective 30 or 45 working days after receipt,

pay, due to its noncompliant reasonable and customary methodology.  Putting aside the serious question whether recovery of a 15 percent statutory rate of interest qualifies as restitution under the UCL, sections 1371 and 1371.35 provide for 15 percent interest only for untimely payment of a claim that is uncontested.  The panel denied Prime's claim for statutory 15 percent interest, in part, on the ground Prime's reimbursement claims were contested.

In its reply appellate brief Prime argues Kaiser did not properly contest its claims for reimbursement, explaining that sections 1371 and 1371.35 require a plan contesting a claim to identify the portion of the claim that is contested by revenue code, as well as the specific reasons for contesting or specific information needed from the provider to reconsider the claim.  It contends Kaiser failed to satisfy those requirements.  The argument there was insufficient evidence to support the panel's factual finding that Kaiser contested Prime's claims is beyond the scope of judicial review.  (See *Moncharsh v. Heily & Blase, supra*, 3 Cal.4th at pp. 10-11.)  Moreover, Prime forfeited this sufficiency of the evidence argument by failing to assert it in its opening appellate brief, despite the superior court's express reliance on this aspect of the panel's finding.  (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158 ["[f]airness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments"]; *Nolte v. Cedars-*

---

the plan shall pay the greater of fifteen dollars ($15) per year or interest at the rate of 15 percent per annum beginning with the first calendar day after the 30- or 45-working-day period."

*Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1409-1410 ["'[a]rguments presented for the first time in appellant's reply brief are considered waived'"].)

Substantively, Prime, as the claimant, had the burden of proving its entitlement to the statutory 15 percent interest. Prime points to no evidence in the arbitration establishing Kaiser had not adequately contested Prime's claims and thus that any error in the panel's finding Kaiser had contested Prime's claims was prejudicial.

> 3. *The Panel Did Not Commit Legal Error in Allowing Kaiser To Recover for Overpayments to Prime*

Kaiser sought reimbursement (restitution) for overpayments to Prime, including payments that exceeded the reasonable value of Prime's services. Primarily at issue on appeal are three categories of overpayments: Payments for services at several Orange County hospitals Prime acquired from Vanguard Health Systems, Inc. as to which Kaiser continued to use either the price terms of a letter agreement it had with Vanguard or rates established through a third-party intermediary network (MultiPlan); payments for services at three hospitals acquired by Prime as to which Kaiser continued to use price terms pursuant to preexisting agreements applicable to those hospitals, referred to as Direct Contracts rates; and payments pursuant to Kaiser's reasonable and customary methodology. Prime contends Kaiser's claims for restitution are time-barred and its payments were, in any event, voluntary and thus not recoverable.

> a. *Kaiser's restitution cross-claims were not time-barred*

Section 1371.1, subdivision (a)(1), provides, "Whenever a health care service plan . . . determines that in reimbursing a

claim for provider services an institutional or professional provider has been overpaid, and then notifies the provider in writing through a separate notice identifying the overpayment and the amount of the overpayment, the provider shall reimburse the health care service plan within 30 working days of receipt by the provider of the notice of overpayment unless the overpayment or portion thereof is contested by the provider in which case the health care service plan shall be notified, in writing, within 30 working days.  The notice that an overpayment is being contested shall identify the portion of the overpayment that is contested and the specific reasons for contesting the overpayment."

Regulation 1300.71(b)(5) provides, "A plan . . . shall not request reimbursement for the overpayment of a claim, including requests made pursuant to Health and Safety Code section 1371.1, unless the plan . . . sends a written request for reimbursement to the provider within 365 days of the Date of Payment on the over paid claim.  The written notice shall include the information specified in section (d)(3).  The 365-day time limit shall not apply if the overpayment was caused in whole or in part by fraud or misrepresentation on the part of the provider."

Regulation 1300.71(d)(3) provides, "If a plan . . . determines that it has overpaid a claim, it shall notify the provider in writing through a separate notice clearly identifying the claim, the name of the patient, the date of service and including a clear explanation of the basis upon which the plan . . . believes the amount paid on the claim was in excess of the amount due, including interest and penalties on the claim."

Relying on these provisions, Prime argues Kaiser's cross-claims for overpayments, not made until more than 365 days

from the date of payment had elapsed,[19] were time-barred.  The panel and the superior court rejected Prime's argument; Prime has not established they erred in doing so.  The two-year limitations period in Code of Civil Procedure section 339 for an action "upon a contract, obligation or liability not founded upon an instrument in writing," not the 365-day notice period of regulation 1300.71(d)(3), governs Kaiser's claims.

Code of Civil Procedure section 312 provides, "Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute."  "[W]here the Legislature intends that another or no limitations period applies, it must say 'so in clear and unmistakable language."  (*County of Marin Assn. of Firefighters v. Marin County Employees' Retirement Assn.* (1994) 30 Cal.App.4th 1638, 1651.)  The plain language of section 1371.1 and regulation 1300.71 does not clearly indicate an intent to limit the time in which health plans may bring a civil action for reimbursement against a provider.  Although regulation 1300.71(b)(5) provides a plan shall not request reimbursement unless it sends a written request for reimbursement within 365 days, the regulation does not bar a

---

[19]    Prime does not indicate when Kaiser first made its claim for overpayments, and the panel made no finding on that issue. Although Prime argued in its closing brief in the arbitration that Kaiser had not established its request for refunds was timely, under traditional allocations of the burden of proof, it would be Prime's responsibility to establish the cross-claims were time-barred.  (See, e.g., *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1197; *Samuels v. Mix* (1999) 22 Cal.4th 1, 8-9.)

civil court action as a consequence of any violation. To the contrary, the record before the panel established the Department has interpreted regulation 1300.71(b)(5) as "not limit[ing] or in any way affect[ing] a plan's right to access the courts to prosecute a civil action to seek reimbursement."[20]

As Kaiser argued in the arbitration, subdivision (s) of regulation 1300.71, titled "Review and Enforcement," although containing no restriction of a plan's ability to file a court action in the event of a violation of any of that regulation's requirements, does provide for discretionary enforcement by the Department. For example, regulation 1300.71(s)(2) provides in part, "Failure of a plan to comply with the requirements of [specified sections of the Health and Safety Code or the Department's regulations, including regulation 1300.71] may constitute a basis for disciplinary action against the plan," including nonexclusive "civil, criminal and administrative remedies." If the Department determines a plan to be engaged in a "Demonstrable and Unjust Payment Pattern," it may assess additional penalties, comprising any combination of (1) an additional monetary penalty commensurate with the seriousness of the demonstrable and unjust payment pattern; (2) imposition for up to three years of a shorter reimbursement time period; and (3) the appointment of a conservator to supervise the plan's claim payment activities. (Reg. 1300.71(s)(6).)

---

[20] The quoted language is contained in a brief filed by the Department in *Blue Cross of California v. Rouillard*, Sacramento County Superior Court Case No. 34-2014-80001733 (*Rouillard* brief). Both Prime and Kaiser relied on the brief and argued statements in it supported their positions, and the panel relied on the brief for its ruling.

Relying on the Department's final statement of reasons for promulgating regulation 1300.71, Prime argues regulation 1300.71(b)(5) "was added to set forth the maximum time frame to assert requests for reimbursement of overpayment of claims." However, the next sentence of the Department's final statement continues regulation 1300.71(b)(5) "was necessary to ensure that plans . . . do not engage in unfair payment patterns in violation of Health & Safety Code Section 1371.1." Thus, a plan that fails to comply with the 365-day notice requirement of regulation 1300.71(b)(5) would be unable unilaterally to compel a provider to comply with section 1371.1's mandate that the provider reimburse an uncontested overpayment within 30 working days or pay 10 percent interest after the 30-working-day period.

The true import of regulation 1300.71(b)(5) as an administrative provision related to disciplinary proceedings initiated by the Department, as well as a requirement related to health plans' informal dispute resolution processes, rather than as a limitations provision applicable to civil actions, becomes apparent when the regulation is viewed in the context in which it was adopted. Section 1367, subdivision (h)(1), provides, "All contracts with providers shall contain provisions requiring a fast, fair, and cost-effective dispute resolution mechanism under which providers may submit disputes to the plan." Section 1367, subdivision (h)(2), provides a plan "shall ensure that a dispute resolution mechanism is accessible to noncontracting providers for the purposes of resolving billing and claims disputes." Although section 1367 was added to the Health and Safety Code in 1978 (Stats. 1978, ch. 285, § 4), it was not until 2000 that health plans were required to expand their informal dispute

resolution processes to include noncontracting providers (Stats. 2000, ch. 825, § 2; Stats. 2000, ch. 827, § 2). At the same time, the Department, through the addition of section 1371.38, was directed to "adopt regulations that ensure that plans have adopted a dispute resolution mechanism pursuant to subdivision (h) of Section 1367." (Stats. 2000, ch. 825, § 7; Stats. 2000, ch. 827, § 7.) In the same legislation the Legislature expressed its intent in making these changes: "To ensure that health care service plans and providers do not engage in patterns of unacceptable practices, the Department of Managed Health Care should be authorized to assist in the development of a new and more efficient system of claims submission, processing, and payment." (Stats. 2000, ch. 825, § 1; Stats. 2000, ch. 827, § 1.)

In addition to regulation 1300.71, the Department, to implement amended section 1367, promulgated regulation 1300.71.38, which provides, "All health care service plans . . . shall establish a fast, fair and cost-effective dispute resolution mechanism to process and resolve contracted and non-contracted provider disputes." (*Epstein v. Vision Service Plan* (2020) 56 Cal.App.5th 223, 232.) "'Arbitration shall not be deemed a provider dispute or a provider dispute resolution mechanism for the purposes of this section.'" (*Ibid.*, quoting regulation 1300.71.38.)

Regulation 1300.71(b)(5)'s requirement that a plan "shall not request reimbursement for the overpayment of a claim" unless it sends a written reimbursement request to the provider within 365 days applies to a plan's request made through this informal dispute resolution process mandated by section 1367. The Department has argued regulation 1300.71(b)(5) does not affect civil or common law remedies or restrict a plan's right to

pursue a civil action seeking recovery of overpayments. Rather, the Department has interpreted regulation 1300.71(b)(5) and (d)(3) to apply "if health plans seek to realize the efficiencies available through the non-judicial processes available under [regulation] 1300.71" or otherwise "reap the financial benefits of the regulatory scheme," including "efficiently and automatically obtain[ing] reimbursement through offset of future claims payments."[21]

Prime's reliance on *Bi-Rite Meat & Provisions Co. v. City of Hawaiian Gardens Redevelopment Agency* (2007) 156 Cal.App.4th 1419 (*Bi-Rite*) and *Superior Strut & Hanger Co. v. Port of Oakland* (1977) 72 Cal.App.3d 987 (*Superior Strut*) to refute this interpretation of regulation 1300.71(b)(5) is misplaced. Neither case concerns the Knox-Keene Act. *Bi-Rite* involved submission requirements under regulations of the California Relocation Assistance Act (*Bi-Rite*, at p. 1426); *Superior Strut* concerned guidelines promulgated by the Commission of Housing and Community Development under the authority of the California Relocation Assistance Law (CRAL) that a displaced party seeking relocation benefits from a public entity file a claim or application with that entity within 18 months (*Superior Strut*, at pp. 992, 1003).

In *Bi-Rite* a displaced party sought to compel a public agency to pay relocation benefits. Bi-Rite argued it had timely filed a claim with the agency within the 18-month limitations period under California Code of Regulations, title 25, section 6088 or, alternatively, good cause existed to extend the limitations period under that regulation's provision for an

---

[21]   See *Rouillard* brief at pages 10-11.

extension upon a proper showing of good cause.  (*Bi-Rite*, *supra*, 156 Cal.App.4th at pp. 1425, 1432; Cal. Code Regs., tit. 25, § 6088.)  Bi-Rite did not argue the regulatory limitations provisions were inapplicable, and the case did not involve any alleged untimeliness of a civil action or claim filed in arbitration.  This court thus had no occasion to consider the issue.  (See *Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 169 ["'[i]t is axiomatic that cases are not authority for propositions not considered'"].)

 *Superior Strut* involved an action by the displaced party against the Port of Oakland for breach of the port's duty imposed by CRAL to pay the company's relocation assistance costs.  The company had filed a damages claim for relocation costs with the port on January 7, 1974.  The port rejected the claim as untimely, and the company filed suit.  (*Superior Strut*, *supra*, 72 Cal.App.3d at pp. 992-993.)  The port argued the company's claim—presented on January 7, 1974, 14 months after the company's November 7, 1972 move—was barred by Government Code section 911.2, which provides a one-year period to present a claim to the public entity.  The court of appeal rejected the port's argument, first holding the company was not required to present a claim before the port, and then, after explaining the administrative guidelines promulgated under CRAL provided an 18-month period from the time of the move to present an application for benefits, holding the trial court was "entitled to consider the applicable limitations period as that established in the relocation guidelines."  Accordingly, the lawsuit filed February 13, 1974 was timely.  (*Superior Strut*, at p. 1003.)  None of the parties had argued the applicable limitations period for the company's civil action was governed by any of the statutory

39

limitations periods prescribed in title 2 of part 2 of the Code of Civil Procedure. (See Code Civ. Proc., § 312.) There was no dispute by the parties the applicable limitations period for the company's civil action was governed by the time in which to present or file a claim or application for benefits.

b. *Satisfying regulation 1300.71(b)(5)'s notice requirement is not a condition precedent to a lawsuit*

As an alternative to its argument that regulation 1300.71(b)(5) establishes a 365-day limitations period for a health plan's civil action for recovery of overpayments, Prime contends the regulation's notice requirement functions as a condition precedent with which plans must comply when filing suit seeking such a recovery.[22] As discussed, however, the Department has construed the regulation as not affecting a plan's ability to file a court action, an interpretation that applies equally to a condition precedent and to a limitations period. We defer to the agency's interpretation, which is fully consistent with our own view of the role the regulation plays in the overall administrative scheme.

In an amicus brief the American College of Emergency Physicians, State Chapter of California, Inc. (ACEP) urges us to construe regulation 1300.71(b)(5)'s 365-day notice requirement as a precondition to filing suit by analogy to the claims-filing requirement of the Government Claims Act (Gov. Code, § 810 et seq.), and, specifically, Government Code section 911.2,

---

[22] The panel rejected that argument, concluding, "[N]othing in the language of [section 1371.1] or [regulation 1300.71(b)(5)] supports converting the 365-day administrative time limit into a condition precedent to the filing of a normal action at law (or arbitration proceeding)."

which specifies a limited period in which a claim may be presented to a public entity.  It is true, as ACEP argues, a claimant's failure to comply with that presentation requirement bars a civil action even if the suit would otherwise be timely. However, Government Code section 945.4 expressly provides, subject to exceptions, "[N]o suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board."  In sharp contrast, nothing in the Knox-Keene Act or its implementing regulations expressly conditions a plan's right to sue for overpayments upon timely notice of the overpayment.  (Cf. *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1240 [""California statutes or ordinances which condition the right to sue the sovereign upon timely filing of claims and actions are . . . elements of the plaintiff's cause of action and conditions precedent to the maintenance of the action""], italics omitted.)

Similarly inapt is ACEP's discussion of the requirement that a complainant must first file a charge with the Equal Employment Opportunity Commission as a precondition to the commencement of a court action under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.).  (See *Fort Bend County, Texas v. Davis* (2019) ___ U.S. ___ [139 S.Ct. 1843, 1846].)  Pertinent title VII "[e]nforcement provisions" set forth detailed procedures under which "a civil action may be brought" "after a charge is filed with the Commission."  (42 U.S.C. § 2000e-5(f)(1).)  And ACEP's reliance on *Hill v. Newkirk* (1994) 26 Cal.App.4th 1047 is also unavailing.  In that case the court of

appeal affirmed the trial court's judgment after sustaining, without leave to amend, a demurrer to a mother's complaint for negligence against a foster parent on the ground the mother had failed to first file a claim with the Foster Family Home and Small Family Home Insurance Fund, as required by section 1527.6, subdivision (d).  (*Hill*, at pp. 1050-1052.)  However, unlike the Knox-Keene Act, section 1527.6, subdivision (d)(1), expressly conditions the right to bring suit against the pertinent party (the foster parent) on a claim having first been filed.

### c. *Permitting Kaiser's restitution claims does not frustrate the purposes of the Knox-Keene Act*

In a final attempt to conjure a basis for construing regulation 1300.71(b)(5)'s notice requirement as a bar to Kaiser's claims, Prime cites *Pacific Bay Recovery, Inc. v. California Physicians' Services, Inc.* (2017) 12 Cal.App.5th 200, 215, which stated the principle that "quantum meruit recovery is inappropriate where it would frustrate the law or public policy." Allowing Kaiser to bring its restitution claims based on quantum meruit principles, Prime contends, would "frustrate" the purpose of the 365-day period to provide notice of overpayment.

The panel's reasoning in addressing a similar argument in another context applies to the scope, and potential consequences, of its ruling concerning regulation 1300.71(b)(5):  "Prime's lawsuit to recover additional reimbursement for claims paid under [reasonable and customary rates] triggered Kaiser's right to seek to contest the [reasonable and customary] payment and pay at reasonable value instead"; "once Prime sought a determination of reasonable value, Kaiser had the reciprocal right to recover if it were determined that the [reasonable and customary] rates at which it had paid exceeded reasonable

42

value." "[I]t would be entirely unfair and illogical," the panel wrote in its final award, "to give a provider a one-sided right to sue a payor to obtain reasonable value" but to "bar the payor from seeking to establish the correct reasonable value."

As discussed, the history of the governing legislation and the regulatory scheme developed in response fully supports the view the Legislature and the Department did not intend to create an unbalanced claims settlement process and dispute resolution mechanism granting providers more rights than those enjoyed by plans. To the contrary, it indicates an intent that the process balance the rights of plans and providers. Indeed, the Knox-Keene Act and its regulations expressly require any dispute resolution mechanism to be "fair." (§ 1367, subd. (h)(1); regulation 1300.71.38.) The legislative history also shows a primary reason for imposing a fast and cost-effective dispute resolution mechanism requirement was to address providers' concerns about obtaining full and timely reimbursement of their claims from health plans. None of these factors applies where the provider voluntarily chooses to bring a civil action and the court (or arbitrator) determines the plan has overpaid. Under those circumstances the plan has more in common with the provider awaiting payment of its claims than the payor attempting to delay the process to avoid payment. Far from frustrating the purpose of the Knox-Keene Act, to preclude a plan from recovering overpayments that, as the panel found here, arose out of the same transactions and same set of claims as those initiated in a court proceeding by a provider would encourage providers to forego entirely the plan's dispute

resolution process, filing a lawsuit after waiting at least a year.[23] Creating an incentive to avoid the "fast, fair and cost-effective" informal dispute mechanism the Legislature and Department intended, not recognizing a plan's right to recover overpayments once the provider puts at issue the reasonableness of payments made, interferes with the legislative and regulatory goals.

### d. *The voluntary payment doctrine does not bar Kaiser's recovery of overpayments*

Prime asserts, even if Kaiser's cross-claim for restitution of overpayments is not time-barred, any payments Kaiser made in excess of the reasonable value of the services provided were

---

[23] Subsection (c) of regulation 1300.71.38 requires plans to establish written procedures for the "submission, receipt, processing and resolution of contracted and non-contracted provider disputes," and subsection (d)(1) prohibits a plan from imposing a deadline for the receipt of a provider dispute that is less than 365 days of the plan's action (or, in the case of inaction, less than 365 days after expiration of the time for contesting or denying claims).

In its final statement of reasons for promulgating regulations 1300.71 and 1300.71.38, the Department explained, "[Regulation] 1300.71.38(d)(1) . . . sets forth the minimum timeframe that a payor must allow for the submission of a provider dispute to its dispute resolution mechanism. The clarifications were necessary to set forth the minimum standards that a payor must meet to comply with Section 1367(h). These minimum standards are not intended to replace or alter existing common law or other statutory contract remedies. Although a plan . . . will not be forced to process a provider dispute submitted more tha[n] a year after its adjudication in its dispute resolution system, a provider is not precluded from pursuing any other civil remedy."

voluntary and, as a consequence, not recoverable. (See *Steinman v. Malamed* (2010) 185 Cal.App.4th 1550, 1557 (*Steinman*) ["'[p]ayments voluntarily made, with knowledge of the facts, cannot be recovered'"]; Rest.3d Restitution and Unjust Enrichment, § 5, com. a ["voluntary payment doctrine" addresses issues where a payor has established a prima facie claim in restitution and the defendant/payee responds that the payment was made voluntarily].)[24] The panel concluded Kaiser's payments at rates other than reasonable value were not voluntary and the voluntary payment doctrine did not bar Kaiser from seeking restitution as to certain (though not all) categories of overpayments. Once again, we agree.

> ### i. *The Vanguard overpayments: background*

Kaiser and Vanguard entered into a letter of agreement providing payment terms for services to be provided by two Vanguard-affiliated hospitals, West Anaheim Medical Center and Huntington Beach Hospital, to Kaiser members. The original term of the letter agreement was to expire on April 30, 2010, subject to exceptions.

Prime acquired the Vanguard hospitals in 2006 and informed Kaiser the letter agreement terminated upon the acquisition. Kaiser disputed the termination and advised Prime the letter agreement was effective until April 30, 2010. Prime responded it would no longer perform services at the letter agreement rate. Kaiser began paying Prime at the MultiPlan

---

[24] Citations to Restatement Third and Rest.3d are to the Restatement Third of Restitution and Unjust Enrichment.

45

rates, which were higher than the letter agreement rates,[25] but reserved its right to recover the amount in excess of the letter agreement rates if Kaiser prevailed in contending the letter agreement remained in effect. Kaiser also expressly reserved "all of its rights and remedies."

Kaiser also contended Prime (Vanguard)[26] never properly terminated the letter agreement and it remained in effect even after April 30, 2010.  Despite its assertion it had the continuing right to pay only the letter agreement rates, Kaiser continued to reimburse Prime at MultiPlan rates after April 30, 2010 because at the time there had been no binding decision as to the letter agreement's termination date.

The panel determined the letter agreement was effective until April 30, 2010 and awarded Kaiser damages for amounts paid to that date in excess of the letter agreement rates.  The panel determined Kaiser's payments at the MultiPlan rates were not voluntary and the voluntary payment doctrine did not bar Kaiser from obtaining restitution of the difference between payments made at MultiPlan rates and letter agreement rates through April 30, 2010.  The panel stated Kaiser paid the higher

---

[25]     For the arbitration's MultiPlan phase the panel explained, although there was no direct contractual relationship between Kaiser and Prime, Prime contended the parties' contracts with MultiPlan created the equivalent of a contractual preferred-provider relationship between Kaiser and Prime, obligating Kaiser to pay Prime at the MultiPlan rates for every claim.

[26]     As explained by the panel in its final arbitration award, although a prior arbitration had determined Prime was not a party or assignee of the letter agreement, it was undisputed Prime had indemnified Vanguard and was liable for any Vanguard-related damages awarded to Kaiser.

rates in the mistaken belief Prime could prevail in its contention the acquisition terminated the letter agreement and under duress because Prime refused to treat Kaiser patients unless Kaiser paid rates higher than the letter agreement rates.

For Kaiser's overpayments after April 30, 2010, the panel similarly determined those payments were not voluntary because Prime had continued to assert the letter agreement was not effective, Kaiser had continued to disagree, and there had been no resolution of the issue. Thus, Kaiser had continued to be mistaken as to the letter agreement's legal termination date and had operated under the duress of Prime's refusal to treat Kaiser patients at letter agreement rates and the potential involvement of the Department. As explained by the panel, Kaiser contended, and the panel agreed, its payment at the MultiPlan rate was a "placeholder" made under a reservation of rights to accommodate for, and pending the outcome of, litigation. The panel concluded Kaiser, after April 30, 2010, had paid at MultiPlan rates pursuant to an effective reservation of rights and was entitled to pay at reasonable value.

The panel also explained Kaiser had continued to pay at MultiPlan rates until March 2011 and then had reverted to paying letter agreement rates up to February 7, 2015. Nevertheless, the panel determined Kaiser should recover the difference between the payments it had made and reasonable value not only with respect to its MultiPlan rate payments but also its post-March 2011 letter agreement rate payments. It stated "this finding is eminently fair" because Prime itself originally acknowledged in the arbitration that Kaiser's payments at MultiPlan rates after the letter agreement's

termination should be repriced at reasonable value, which Prime at the time believed would be higher than MultiPlan rates.

The superior court, in its order granting the petition to confirm and denying the petition to vacate the arbitration award, concluded the panel's determination that all of the Kaiser overpayment categories were not voluntary constituted factual findings that were unreviewable under the parties' arbitration agreement.  The court also ruled, with respect to the Vanguard overpayments after the letter agreement's termination, the panel had made a factual finding Kaiser did reserve its rights and Prime had, in any event, forfeited its reservation-of-rights argument.

> ii. *Vanguard overpayments:  payments at MultiPlan and letter agreement rates after April 30, 2010 are not subject to the voluntary payment doctrine*

Prime, relying *on Steinman*, *supra*, 185 Cal.App.4th 1550 and *Western Gulf Oil Co. v. Title Ins. & Trust Co.* (1949) 92 Cal.App.2d 257 (*Western Gulf*), contends Kaiser's recovery of the Vanguard overpayments after April 30, 2010 was barred absent a reservation of rights[27] and asserts Kaiser did not reserve rights to reprice its payments below the letter agreement rates to reasonable value. With regard to Kaiser's post-April 30, 2010 payments at the MultiPlan rates, however, Prime fails to address the panel's ruling that Prime effectively forfeited its challenge to Kaiser's recovery of damages for the Vanguard overpayments after April 30, 2010 by originally acknowledging that Kaiser's

---

[27]     Prime does not challenge the panel's award under the voluntary payment doctrine for any Vanguard overpayments before May 1, 2010.

48

payments at MultiPlan rates after the letter agreement's termination should be repriced at reasonable value.

In any event, the panel, relying on various arbitration exhibits, found Kaiser had reserved its rights to the rate "the Panel ultimately determined was correct." That factual finding is not subject to judicial review under the parties' arbitration agreement. (See *Moncharsh v. Heily & Blase*, *supra*, 3 Cal.4th at pp. 10-11 [generally, sufficiency of the evidence supporting an arbitration award is not subject to judicial review]; cf. *Steinman*, *supra*, 185 Cal.App.4th at p. 1556 [trial court's finding that payment "was made under protest and was not voluntarily made" was a factual finding subject to limited appellate review for substantial evidence].)

As for Kaiser's post-April 30, 2010 payments at the letter agreement rates, Prime also fails to show that, under the circumstances, including the panel's finding Kaiser made those payments under the mistaken belief the letter agreement had not yet terminated, the panel committed an error of law in concluding restitution was not barred by the voluntary payment doctrine even if, as Prime argues despite the panel's contrary findings, Kaiser did not expressly reserve its rights to seek recovery of any overpayments and was not acting under duress. (See *American Oil Service v. Hope Oil Co.* (1961) 194 Cal.App.2d 581, 585-587 [where overpayments were made under a mistake, the evidence was insufficient to justify a finding the plaintiff making the payments "had such knowledge of the facts as would have rendered the payments voluntary"; "[w]hether the payments were made voluntarily or through mistake depended upon the intentions of plaintiff in making them"]; Rest.3d, § 5, com. a ["a 'voluntary payment' is a transaction in which the payor chooses

49

to act in the face of knowledge that the payment may not in fact be due"]; 1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 1059, p. 1106 ["[a] person who pays money under the mistaken belief that he or she is under a duty to do so may recover it"].)[28] Indeed, because Kaiser paid at letter agreement rates after the April 30, 2010 termination date in accordance with its own mistaken belief the agreement was still in effect, and in contravention to Prime's position otherwise, it would be incongruous to require Kaiser to have made those payments under protest or with a reservation of rights. If duress were an invariable requirement for restitution, a payor who mistakenly overpays but otherwise makes its payment freely could never recover. The Prime parties cite no authority requiring such a result.

*Steinman*, *supra*, 185 Cal.App.4th 1550 and *Western Gulf*, *supra*, 92 Cal.App.2d 257, on which Prime relies to argue Kaiser cannot recover payments otherwise voluntarily made where it reserved no rights of recovery and was under no duress, are inapposite. In both cases the payor had paid the amount demanded by the recipient even though the payor did not agree

---

[28] The Restatement Third, section 6, states, "Payment by mistake gives the payor a claim in restitution against the recipient to the extent payment was not due." The Restatement Third, section 35, comment d, further states, "Other sections of this Restatement that authorize restitution to recover an overpayment (or other overperformance) include no requirement of formal protest. If a party has paid an overcharge without realizing it, the restitution claim is based on payment by mistake. (There can be no 'protest,' just as there can be no 'voluntary payment,' before the paying party is aware of the overcharge. [Citation].)"

that amount was in fact due:  In *Steinman* the payor FMA wrote it would send the demanded funds "under protest" "despite our belief that your calculation may be in error" (*Steinman*, at p. 1557); and in *Western Gulf* the payor wrote its payment of the demanded amount "was made solely to avoid a possible forfeiture of the lease" and "was made without any admission that the lessor's royalty oil was not properly chargeable" (*Western Gulf*, at p. 261).

The facts of neither case indicate a mistake had been made; to the contrary, the payor in both cases knowingly paid the disputed amount demanded.  In neither case did the payor assert the overpayment was made under a mistake or otherwise without "knowledge of the facts."  Rather, the issue in both cases was whether the payor had submitted to the demand under protest or a reservation of rights and (in the case of *Steinman*), even if it did, whether that was sufficient to render the payor's performance of the demand involuntary in the absence of something more, including enforcement by coercion.  As Prime indicates, both cases state, "'Payments of illegal claims enforced by duress, coercion or compulsion, when the payor has no other adequate remedy to avoid it, will be deemed to have been made involuntarily and may be recovered, but the payment must have been enforced by coercion and there must have been no other adequate means available to prevent the loss.'"  Neither case, however, stands for the proposition that paying an illegal claim under duress, coercion or compulsion[29] is the exclusive means to

---

[29]	The Restatement Third, at comment d of section 35 (pertaining to performance with a reservation of rights of a disputed obligation in excess of contractual requirements), explains, "When restitution is authorized under this section, the

establish a claim for restitution and is required even in cases of mistake.  (*Steinman*, *supra*, 185 Cal.App.4th at p. 1558; *Western Gulf*, *supra*, 92 Cal.App.2d at p. 265.)

In its appellate reply brief, Prime advances several new arguments to show Kaiser's mistake regarding the contractual termination date is not the type of mistake that would allow Kaiser to avoid the bar of the voluntary payment doctrine. However, although the panel relied on that mistake as among the circumstances for finding Kaiser did not make a voluntary payment and the superior court relied on the panel's no-voluntary-payment factual finding (specifically, the unreviewable nature of that finding) as among the reasons to confirm the arbitration award, Prime did not raise its arguments concerning the nature of a mistake necessary to avoid the voluntary payment doctrine bar in its opening brief.  It thus forfeited those arguments.  (See, e.g., *United Grand Corp. v. Malibu Hillbillies, LLC*, *supra*, 36 Cal.App.5th at p. 158.)

Those arguments are also unavailing.  Relying on the panel's reference with respect to the Direct Contracts overpayments to Kaiser's mistake as to whether those contracts

---

basis of the claim is not the claimant's statement to the defendant that he is performing 'under protest,' 'without prejudice,' or the like.  The reason for restitution is that the claimant has performed under compulsion, conferring a benefit to which the defendant was not entitled under the contract." *Steinman, supra,* 185 Cal.App.4th 1550 merely shows that, where the reason for the claimed involuntariness of a payment of an illegal claim is that the payment was made under protest or a reservation of rights (that is, under compulsion), the payor must also establish something more, including enforcement by coercion.  (*Id.* at p. 1558.)

remained effective as "a legal or factual mistake," Prime contends a voluntary payment made under a mistake of law cannot be recovered: "[I]f Kaiser actually made a mistake of law regarding the contracts' termination date," Prime argues, "that mistake does not allow it to recover." Prime relies on a 1931 Supreme Court case, *Westman v. Dye* (1931) 214 Cal. 28, 32, and a 1949 Fourth District case, *Draper v. Grant* (1949) 91 Cal.App.2d 566, 571, neither of which involves a claim for restitution based on unjust enrichment.

The statement from *Westman v. Dye*, *supra*, 214 Cal. 28 on which Prime relies was a quotation from *Harralson v. Barrett* (1893) 99 Cal. 607, 611, which held, if a borrower "'voluntarily fulfills his promise to pay interest, it is through a mistake of law on his part or a waiver of a known right. In either case he is bound by his own act.'" (*Westman,* at p. 32.) As explained by the *Westman* Court, the *Harralson* case arose under a section of the California Constitution repealed in 1906. (*Westman*, at p. 31.) *Westman* itself did not rely on the voluntary payment doctrine or any distinction between mistakes of law or fact. To the contrary, the *Westman* Court, in interpreting usury law applicable to a defendant's claim for a refund of excessive (usurious) interest, declined to apply the rule recognized in other states barring recovery of usurious interest voluntarily paid and instead held the defendant was entitled to set off his interest payments against his principal debt. (*Westman*, at pp. 30, 34-37; see *Stock v. Meek* (1950) 35 Cal.2d 809, 817-818.) The Supreme Court years later in *Stock v. Meek* (which, like *Westman*, also involved a claim for refund of usurious interest paid) held, "'[V]oluntary' payments of interest do not waive the rights of the payors," and distinguished *Harralson v. Barrett* as "not in point" because it

"involved a constitutional provision of limited applicability." (*Stock*, at p. 817.)

More importantly, "'the more modern doctrine [is] that mistakes of law and fact should be treated alike.'" (*Willis v. Bank of America* (1973) 33 Cal.App.3d 745, 752; accord, *First Sav. & Loan Assn. v. Bank of America* (1970) 4 Cal.App.3d 393, 395 ["The Bank correctly points out that the older California cases made a distinction between a mistake of law and a mistake of fact, and allow restitution only for mistakes of fact. However, the recent California cases appear to be following the more modern doctrine that mistakes of law and fact should be treated alike"]; see 1 Witkin, *supra*, § 1059, p. 1107 ["Under the modern view, both in contract and quasi-contract actions recovery may be had for payment under mistake of law as well as mistake of fact"]; Rest.3d, § 5 ["A transfer induced by invalidating mistake is subject to rescission and restitution"; "[a]n invalidating mistake may be a misapprehension of either fact or law"], com. g ["The present section rejects any distinction between mistake of fact and mistake of law, adopting a conclusion reached long ago by the better-reasoned American decisions. The old distinction between mistake of fact and mistake of law is repudiated because [among other reasons] it has always been theoretically unsound"].)

Prime also contends in its reply brief Kaiser had "knowledge of the facts" because it knew Prime claimed the relevant contracts at issue for the challenged overpayment categories (the Direct Contracts and, for the Vanguard overpayments, the letter agreement) were not in effect. Despite the knowledge of the dispute, it argues, Kaiser paid without reserving its rights and thus cannot recover its overpayments

54

notwithstanding its claim of mistake.  In support of that argument Prime relies on a single-sentence partial quotation from the Restatement Third, section 6, comment e:  "A more appropriate statement of the voluntary payment rule . . . is that money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, on the ground of 'mistake,' merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation."

However, whether a payor decides to act in the face of a recognized uncertainty is only relevant to show the payor has "consciously assumed the risk" of the mistake.  (See Rest.3d, § 5.) In the language omitted by Prime, the Restatement Third, section 6, comment e continues, "Because a payor in a business setting will not gratuitously assume the risk of a recognized uncertainty as to either the fact or the extent of its liability, a 'voluntary' overpayment within the meaning of the voluntary payment rule will normally occur in the context of a payment made to settle a claim.  Where the terms of settlement involve an explicit compromise of an uncertain liability, the contractual mechanism by which a risk of uncertainty is allocated to the payor is transparent.  But there may be settlement even in the absence of compromise.  If a disputed claim is paid in full, notwithstanding a recognized uncertainty as to the existence or extent of the payor's liability, the payor has typically made a conscious decision that the anticipated cost of resisting the claim exceeds the amount of the demand.  Payment under these circumstances is 'voluntary' to the extent that the settlement is voluntary."  Comment e clarifies the voluntary payment rule does not "bar a restitution claim to recover a mistaken payment,

notwithstanding that payment was made by way of settlement, where the mistake in question is not one of the uncertainties that the parties' transaction was understood to settle." It also states, "The [voluntary payment] rule does not . . . impute knowledge of relevant circumstances of which the payor is not in fact aware, describing as 'voluntary' a payment that was actually the consequence of negligence or inadvertence."[30]

Here, payment at the letter agreement rates (or the rates under the relevant contracts for the Direct Contracts overpayment category) conformed to Kaiser's own position that the letter agreement was still in effect, not in acquiescence to Prime's contrary view, and not as part of any settlement.[31] Kaiser's being aware Prime disputed the agreements were still in effect is not the same as Kaiser's knowing the agreements had terminated but continuing to pay according to the letter agreement rates nonetheless.

---

[30] As a general rule, a "claim in restitution is not affected by the claimant's negligence, because rights of ownership are not dependent on the owner's degree of care." (Rest.3d, § 5, com. f; see *id.*, § 5 ["[a] claimant does not bear the risk of a mistake merely because the mistake results from the claimant's negligence"].)

[31] Recognizing this distinction, the panel rejected Kaiser's claims for overpayments for improper billings where, knowing it lacked full information and recognizing the uncertainty of the propriety of Prime's charges, Kaiser nevertheless paid those charges in the absence of any compulsion or obligation to do so despite contending they were improper. The panel determined Kaiser's overpayment claims with regard to those charges were barred as voluntary payments.

### iii. *Direct Contracts overpayments:  background*

In 2006 and 2008 Prime acquired three hospitals having agreements with Kaiser (the Direct Contracts).  Prime argued it never assumed those contracts; Kaiser argued the contracts bound Prime after the acquisition.  Kaiser paid post-acquisition claims at the three hospitals at the contract rates; Prime contended it was entitled to its full billed charges either as a penalty or as reflective of reasonable value.  The panel found Prime never assumed the contracts.  Kaiser sought restitution of the difference between the Direct Contracts rates it paid and reasonable value.

As discussed, the panel found Kaiser was "operating under a legal or factual mistake," believing the Direct Contracts remained in effect after the acquisition and, in reliance on that mistaken belief, paying Prime at the contract rates, although Kaiser was actually obligated to pay only reasonable value.  The panel concluded the voluntary payment doctrine thus did not preclude Kaiser from recovering in restitution the difference between its payments and reasonable value, as determined by the panel.

### iv. *Reasonable and Customary overpayments: background*

In the final arbitration award the panel explained Kaiser sought restitution for the difference between amounts Kaiser paid applying its reasonable and customary methodology and reasonable value as found by the panel.  The panel concluded "it cannot reasonably be said that Kaiser acted voluntarily" and the

voluntary payment doctrine did not bar Kaiser from recovering restitution damages of that difference.

In determining whether Kaiser's payments were voluntary, the panel found Kaiser "lacked critical information" for a reasonable value determination at the time of its payments: Kaiser had developed its reasonable and customary methodology in the absence of information, including "rates that Prime accepted from other payors," that became available only through discovery in the parties' litigation preceding the arbitration.  The panel also found Kaiser had made payments under its reasonable and customary methodology under legal compulsion because the Knox-Keene Act requires a health plan to make payment using that methodology "within short prompt-pay periods."  Kaiser thus had "no legal alternative" to making payments under its methodology pending a judicial or arbitration determination of reasonable value.

> v. *Kaiser's Direct Contracts and Reasonable and Customary overpayments are not subject to the voluntary payment doctrine*

Prime asserts the same arguments—Kaiser cannot recover payments voluntarily made where it reserved no rights and was not acting under duress—for the Direct Contracts and Reasonable and Customary overpayments.  For the reasons discussed with respect to the post-April 30, 2010 Vanguard overpayments at letter agreement rates, we reject those arguments.

In addition, as to the Reasonable and Customary overpayments, Prime makes additional arguments in its reply brief challenging the panel's finding that Kaiser lacked essential information:  It argues Kaiser had contended in litigation its

58

reasonable and customary methodology was "fully adequate," controlled all "inputs going into that calculation," and made "its own, unilateral decision about how much to reimburse." Prime forfeited those arguments not only for failure to raise them in its opening appellate brief (see, e.g., *Nolte v. Cedars-Sinai Medical Center*, *supra*, 236 Cal.App.4th at pp. 1409-1410) but also for failure to support them with citations to the record and pertinent legal authority (see *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 796-797 [reviewing court may treat argument as forfeited when appellant fails to provide record citations supporting its contentions]; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["'[t]he absence of cogent legal argument or citation to authority allows this court to treat the contention as waived'"]). Moreover, Prime fails to show its arguments concerning the state of Kaiser's knowledge of relevant information constitute anything other than a nonreviewable challenge to a factual finding by the panel.

5. *Prime's State Law Claims Relating to Services Provided to Kaiser's Medicare Advantage Members Are Preempted*

    a. *Procedural background*

        i. *Kaiser's summary adjudication motion and the panel's Medicare Advantage partial final award*

The Medicare Advantage program permits Medicare beneficiaries (individuals 65 years of age or older and certain persons with disabilities) to receive Medicare benefits through privately managed health care plans. Medicare Advantage organizations like Kaiser are paid a monthly fee for beneficiaries who enroll in a Medicare Advantage plan.

In May 2015 Kaiser moved in the arbitration for summary adjudication of Prime's state law claims based upon services

provided to Kaiser's Medicare Advantage members. Kaiser argued Prime could not pursue those claims in the arbitration because they were preempted by the Medicare Act and also argued Prime could not pursue those claims in federal court without first exhausting federal administrative remedies.[32] Relying on the "broad preemption clause" of Part C of the Medicare Act set forth at 42 United States Code section 1395w-26(b)(3), Kaiser argued Prime's claims were preempted because they depend on standards created by the Centers for Medicare & Medicaid Services (CMS), the agency within the United States Department of Health and Human Services tasked with administering the Medicare Advantage program.

In its opposition papers Prime described the substantive basis for its Medicare Advantage claims, explaining, with numerous citations to provisions of both the Health and Safety Code and federal statutes, its various legal obligations. According to Prime, it is required by California and federal law to provide a medical screening examination to determine whether an individual who presents at one of its emergency departments has an emergency medical condition; provide medical treatment to stabilize the condition if the physician decides the individual has one; and provide that care whether or not the individual is able to pay and may not ask about the individual's insurance status or ability to pay "until the emergency medical condition has been stabilized." Again citing both state and federal law,

---

[32] In their arbitration agreement the parties agreed "that, as to the Medicare Advantage claims, the arbitrators will be empowered to determine whether those claims should be dismissed based on federal preemption and/or exhaustion of administrative remedies."

Prime stated health plans must reimburse hospitals for the care necessary to stabilize the individual's emergency medical condition as long as that care was actually provided and, in the absence of a contract between the hospital and the plan, utilize reimbursement rates set by California and federal law for the emergency medical care provided.  Prime also advised the panel that, under California and federal law, "health plans are prohibited from requiring that emergency medical care be pre-authorized" "or from requiring members to seek emergency medical care at a preferred or any particular hospital."  "[T]he sole authority to determine stability is vested in the treating physician, and that determination is binding on the health plan," Prime averred.  Finally, Prime asserted the reimbursement rates on Prime's Medicare Advantage claims were undisputed.

Prime argued in its summary adjudication opposition that "these laws and policies are directly at issue in this case:  Kaiser refused to vest proper authority in the treating physician, denying claims as 'unauthorized,' based on Kaiser's unilateral decision in hindsight that the patients were not in need of emergency services as defined under California law and EMTALA."  Prime explained, "Prime's claims are based on Kaiser's systematic policy of ignoring the determinations made by treating physicians at Prime hospitals that patients were not stable to be transferred to Kaiser hospitals for purely financial reasons."  Prime continued, "Kaiser used this policy, and its tactic of bullying non-Kaiser physicians to transfer patients to Kaiser hospitals to reduce costs," to "refuse[] to pay for the emergency treatment, claiming that in its unilateral post hoc review, the patients were stable for transfer."  "Thus, questions regarding whether emergency care was required and when patients were

stable to be transferred for purely financial reasons will be governed and resolved by California law and EMTALA."[33] Prime asserted the consistency of the "Medicare law" with state law and EMTALA on the issues did not convert a state law claim into one arising from Medicare.

Prime in its opposition argued its claims were not subject to administrative exhaustion; complete preemption was inapplicable to the case; and there was no field, conflict, implied or express preemption. With regard to express preemption, Prime, among other matters, argued only "positive state enactments"—that is, state statutes and administrative regulations—were subject to preemption and its state common law claims were thus not expressly preempted.

In a September 8, 2015 partial final award the panel determined Prime's claims were not preempted and were not subject to exhaustion of administrative remedies.

Kaiser, after an unsuccessful petition to vacate the September 2015 Medicare Advantage partial final award in superior court, appealed the superior court's "judgment" confirming the partial final award. In a published opinion (*Kaiser Foundation Health Plan, Inc. v. Superior Court* (2017) 13 Cal.App.5th 1125) this court held we lacked jurisdiction to consider the appeal and, construing Kaiser's papers as a petition for extraordinary writ, issued a peremptory writ of mandate

---

[33] Internal footnotes have been omitted. In those footnotes, Prime cited California and federal statutory provisions setting forth the definitions for "emergency medical condition" and "stabilized" or "[t]o stabilize," as well as Health and Safety Code section 1317.2, which provides the conditions for transfer from one hospital to another of a person needing emergency services.

directing the superior court to vacate its judgment confirming the partial final award and to enter a new order dismissing Kaiser's petition to vacate the award.

ii. *Kaiser's motion for reconsideration*

On October 9, 2017 Kaiser moved in the arbitration for reconsideration of the partial final award regarding the Medicare Advantage claims. Kaiser explained the parties' dispute concerned whether the patients' medical conditions had been stabilized at the time services were rendered: Kaiser contended Prime provided services after the patients had been stabilized and Prime's services were thus not covered by Medicare Advantage; Prime asserted it provided services prior to patient stabilization and its services were covered and should have been paid. Kaiser represented, if the services were appropriately prestabilization services, the parties agreed the services would be covered, with Medicare setting the payment rate.

Kaiser argued the panel should reconsider its Medicare Advantage partial final award on the ground, in the two years since the award, federal and state courts had issued new opinions establishing preemption and administrative exhaustion apply to Prime's Medicare Advantage claims. Kaiser also argued reconsideration was warranted because of Prime's subsequent positions in the arbitration and in other litigation acknowledging that Medicare Advantage regulations were crucial to its Medicare Advantage claims.

In its opposition Prime asserted, with regard to express preemption, although "an applicable Medicare standard may preempt state law," the panel had properly concluded there was no such standard here. Prime contended, "Rather, . . the applicable standards are found in EMTALA. EMTALA is not

part of Medicare Part C, and thus could not preempt Prime's claims." Prime stated EMTALA, not Medicare Part C, provided the standard for determining stability. Prime also argued the regulatory provisions relied upon by Kaiser govern the relations between CMS and the Medicare Advantage organization and do not impact the provider. It further pointed out one of the CMS's regulatory provisions on which Kaiser relied was identical to state law.

### iii. *The Medicare Advantage second amended interim award*

In a February 2018 second amended interim award regarding Prime's Medicare Advantage claims the panel, in a two-to-one decision, ruled it lacked jurisdiction over Prime's Medicare Advantage claims both because Prime had failed to exhaust its administrative remedies and because the claims were expressly preempted by Medicare Part C standards.[34]

### iv. *The final arbitration award's dismissal of, and subsequent superior court proceedings regarding, Prime's Medicare Advantage claims*

The final arbitration award dismissed Prime's Medicare Advantage claims for lack of jurisdiction. The parties briefed and argued the issues of administrative exhaustion and preemption in connection with Kaiser's petition to confirm the arbitration award and Prime's petition to vacate it. In its order granting Kaiser's and denying Prime's petition, the superior court

---

[34] The arbitration agreement provided the arbitrators "shall have the power to grant all legal and equitable remedies available to the Parties under California law" and did not mention any power of the panel to grant remedies under federal law.

64

concluded, with respect to Prime's claims for services rendered to Kaiser Medicare Advantage members, the claims were subject to exhaustion and the state law claims were preempted.

b. *General principles of preemption*

The United States Supreme Court has traditionally recognized preemption of state law by federal enactments pursuant to the supremacy clause (U.S. Const., art. VI, cl. 2) in three circumstances: (1) express preemption; (2) implied (or field) preemption; and (3) conflict preemption. (*English v. General Electric Co.* (1990) 496 U.S. 72, 78-79.) Express preemption, which is pertinent here, exists when Congress defines the extent to which its enactments will displace state law. (*Id.* at p. 78; *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n* (1983) 461 U.S. 190, 203-204 ["[i]t is well established that within constitutional limits Congress may pre-empt state authority by so stating in express terms"].) "If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." (*Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 76.)

Preemption analysis generally begins with a presumption against preemption, that is, "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (*Rice v. Santa Fe Elevator Corp.* (1947) 331 U.S. 218, 230; accord, *Altria Group, Inc. v. Good, supra,* 555 U.S. at p. 77.) "This assumption provides assurance that 'the federal-state balance' [citation] will not be disturbed unintentionally by Congress or unnecessarily by the courts." (*Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 526.) When the text of a federal law

containing a preemption clause is open to more than one plausible interpretation, courts ordinarily "accept the reading that disfavors pre-emption." (*Bates v. Dow Agrosciences*, *LLC* (2005) 544 U.S. 431, 449; accord, *Altria Group, Inc.*, at p. 77; *Brown v. Mortensen* (2011) 51 Cal.4th 1052, 1064.)

Federal laws may preempt state common law as well as state legislation. (*Riegel v. Medtronic, Inc.* (2008) 552 U.S. 312, 324-325 ["in the context of this legislation excluding common-law duties from the scope of pre-emption would make little sense. State tort law that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect. Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation"]; *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 521; see *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1487, fn. 5.)

### c. *The Medicare Act*

"The Medicare Act, 42 United States Code section 1395 et seq. . . . established a federally subsidized health insurance program that is administered by the Secretary of Health and Human Services (the Secretary)." (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 416.) "Under the Medicare Act, Title XVIII of the Social Security Act, . . . the Secretary . . . reimburses the providers of covered health services to Medicare beneficiaries, see §§ 1395f(b)(1), 1395h, 1395x(v)(1)(A)." (*Your Home Visiting Nurse Services, Inc. v. Shalala* (1999) 525 U.S. 449, 450-451.) Enacted in 1965 (*Azar v. Allina Health Services* (2019) ___ U.S. ___ [139 S.Ct. 1804, 1808]), "[t]he Medicare Act [was] divided into two parts. Part A provides insurance for hospital and related

posthospital services.  [Citations.]  Part B provides a voluntary program of supplementary medical insurance covering, in general, 80% of the reasonable costs of certain other services, primarily physicians services and medical supplies." (*Schweiker v. McClure* (1981) 452 U.S. 1301, 1301-1302.)

"[T]he Balanced Budget Act of 1997 [BBA] (Pub. L. 105-33) . . . establish[ed] a new Part C of the Medicare program, known as the Medicare+Choice (M+C) program," in which "every individual entitled to Medicare Part A and enrolled under Medicare Part B . . . could elect to receive benefits either through the original Medicare program or an M+C plan," subject to exceptions.  (69 Fed.Reg. 46866, 46868 (Aug. 3, 2004).)  "The BBA authorized [CMS] to contract with private organizations offering a variety of private health plan options for beneficiaries." (*Ibid*.)

In 1997 Part C included a preemption clause that provided, "(A) IN GENERAL.—The standards established under this subsection shall supersede any State law or regulation (including standards described in subparagraph (B)) with respect to Medicare+Choice plans which are offered by Medicare+Choice organizations under this part to the extent such law or regulation is inconsistent with such standards. [¶] (B) STANDARDS SPECIFICALLY SUPERSEDED.—State standards relating to the following are superseded under this paragraph: [¶] (i) Benefit requirements. [¶] (ii) Requirements relating to inclusion or treatment of providers. [¶] Coverage determinations (including related appeals and grievance processes)." (Pub.L. No. 105-33, § 1856(b)(3) (Aug. 5, 1997) 111 Stat. 251.)[35]

---

[35] Congress again amended the Part C preemption clause in 2000 by inserting the parenthetical "(including cost-sharing requirements)" after the reference to "Benefit requirements" in

67

Subsequently, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the 2003 Medicare Modernization Act) replaced the Medicare+Choice program with the Medicare Advantage program under Part C of Medicare. (69 Fed.Reg. 46866, 46867 (Aug. 3, 2004); Pub.L. No. 108-173, § 201 (Dec. 8, 2003) 117 Stat. 2066 ["any reference to 'Medicare+Choice' is deemed a reference to 'Medicare Advantage' and 'MA,'" and "any reference to 'Medicare Advantage' or 'MA' shall be deemed to include a reference to 'Medicare+Choice'"]; see *Azar v. Allina Health Services*, *supra*, ___ U.S. ___ [139 S.Ct. at p. 1809] ["Congress created 'Medicare Part C,' sometimes referred to as Medicare Advantage"].) Generally, under the Medicare Advantage program, "all beneficiaries . . . have a choice in how they get their Medicare benefits, whether through a Medicare Advantage plan [under Medicare Part C] or the traditional fee-for-service program" under Medicare Parts A and B. (69 Fed.Reg. 46867; see 42 U.S.C., §§ 1395w-21—1395w-22.)

The 2003 Medicare Modernization Act amended the Part C preemption clause to provide the current language: "(3) RELATION TO STATE LAWS.—The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] plans which are offered by [Medicare Advantage] organizations under this part." (Pub.L. No. 108-173, § 232 (Dec. 8, 2003) 117 Stat. 2066;

---

subparagraph (B)(i) and by adding a new subparagraph (B)(iv): "(iv) Requirements relating to marketing materials and summaries and schedules of benefits regarding a Medicare+Choice plan." (Pub.L. No. 106-554, § 614 (Dec. 21, 2000) 114 Stat. 2763.)

42 U.S.C. § 1395w-26(b)(3).)  It is this provision upon which Kaiser bases its preemption argument.

### d. *Prime's Medicare Advantage state law claims were expressly preempted*

On appeal Prime contends the panel (and superior court) erred in concluding its state law claims relating to services provided to Kaiser's Medicare Advantage members were preempted given the presumption against preemption and the absence of a showing that Congress clearly intended to preempt state laws as applicable to its claims.  Relying on *Cotton v. StarCare Medical Group, Inc.* (2010) 183 Cal.App.4th 437 (*Cotton*) and *Yarick v. PacifiCare of California* (2009) 179 Cal.App.4th 1158 (*Yarick*), Prime argues courts have construed narrowly the Medicare Part C preemption clause on which Kaiser relies (42 U.S.C. § 1395w-26(b)(3)) and have rejected Kaiser's proposed broad preemption of common law remedies.  Prime asserts the Secretary's guidance confirms Medicare Part C standards do not preempt state common law contract claims between providers and Medicare Advantage organizations like Kaiser.  Finally, Prime argues *Roberts v. United Healthcare Services*, *Inc.* (2016) 2 Cal.App.5th 132 (*Roberts*), on which the panel and superior court relied to conclude Prime's state claims are preempted, is factually distinguishable, did not address the Secretary's guidance and fails to follow what Prime asserts is the proper preemption analysis of *Yarick* and the duty to accept any plausible reading of a clause disfavoring preemption.

As indicated by Prime's description of the substantive basis for its claims when it opposed Kaiser's summary adjudication motion, Prime relies in substantial part on California law for the

resolution of its claims in an area in which Medicare Part C regulations have established standards. Specifically, by regulations the Secretary (through CMS) promulgated under part 422 of title 42 of the Code of Federal Regulations, the Secretary has "establishe[d] standards and set[] forth the requirements, limitations, and procedures for Medicare services furnished, or paid for, by Medicare Advantage organizations through Medicare Advantage plans" (42 C.F.R. § 422.1(b)), including standards governing whether the Medicare Advantage organization may be financially responsible for emergency services regardless of whether there is prior authorization for such services (42 C.F.R. § 422.113(b)(2)(ii)); whether the Medicare Advantage organization may be financially responsible regardless of whether its members obtain such services at a hospital within or outside the organization (42 C.F.R. § 422.113(b)(2)(i)); and whether the physician treating the plan enrollee must determine when the enrollee may be considered stabilized for transfer and whether that determination is binding on the Medicare Advantage organization (42 C.F.R. § 422.113(b)(3)). In addition, the Secretary has promulgated standards defining covered emergency services as those "needed to evaluate or stabilize an emergency medical condition" (42 C.F.R. § 422.113(b)(1)(ii)(B)) and providing a definition for "[e]mergency medical condition" (42 C.F.R. § 422.113(b)(1)(i)). The Secretary has also promulgated standards governing a Medicare Advantage organization's financial responsibility for post-stabilization care services (42 C.F.R. § 422.113(c)), including providing a definition of such services (*ibid*.), as well as a Medicare Advantage organization's obligation to pay for emergency services provided by noncontracting providers

(42 C.F.R. § 422.100(b)). Prime's state common law claims relating to services provided to Kaiser's Medicare Advantage members are thus expressly preempted under the plain language of Medicare Part C's express preemption clause. (See *Roberts*, *supra*, 2 Cal.App.5th at pp. 139, 143 [determining, in a lawsuit resting primarily on claims that plan marketing materials misrepresented the scope of in-network services and thus the likely copayments due, Medicare Part C standards governing the content of a Medicare Advantage plan's marketing materials and adequacy of its network preempted state common law claims (with respect to Medicare Advantage plan), which did not deal with licensing or plan solvency].)

Prime attempts to avoid the inevitable consequence of its reliance on state law standards as an element of its Medicare Advantage claims by asserting the Secretary has issued guidance indicating common law contract claims are not preempted. Specifically, Prime relies on the following statements by CMS in promulgating the regulation containing an express preemption clause applicable to Medicare Part D plans (42 C.F.R. § 423.440(a)), which is substantially the same as the Medicare Part C preemption clause: "In areas where we have neither the expertise nor the authority to regulate, we do not believe that State laws would be superseded or preempted. For example, State environmental laws, laws governing private contracting relationships, tort law, labor law, civil rights laws, and similar areas of law would, we believe, continue in effect. . . . Rather, our Federal standards would merely preempt the State laws in the areas where . . . Congress intended us to regulate." (70 Fed.Reg. 4194, 4319 (Jan. 28, 2005).)

Here, however, Prime acknowledged in its oppositions to Kaiser's motions for summary adjudication and for reconsideration that it relies for resolution of its claims on California law in an area also covered by Medicare Part C standards. Indeed, for its implied-in-law contract cause of action Prime at paragraph 189 of the first consolidated complaint alleged the "terms of this implied-in-law contract are established by several California statutes and regulations and certain federal statutes and regulations"[36] requiring Kaiser "to timely pay for emergency and authorized post-stabilization medical services ordered by a treating physician." As discussed, those are issues governed by Medicare Part C standards, which preempt any otherwise applicable state law relied upon by Prime.[37]

Prime also quotes from an amicus curiae letter brief filed by the United States government (including the Secretary) in a

---

[36] The only California statutes and regulations specifically identified as establishing the terms of the implied-in-law contract were Health and Safety Code sections and a regulation promulgated under the Knox-Keene Act. The only federal statutes and regulations specifically mentioned were Medicare Part C regulations (42 C.F.R. §§ 422.113(b)(2) and 422.214) and EMTALA. Prime on appeal does not challenge the panel's conclusion that "Prime could not base its claim on EMTALA because EMTALA does not require Kaiser to pay anything," and (2) "EMTALA indeed was incorporated into Part C."

[37] As for any arguments relying on any implied-in-fact contract claim to the extent not forfeited for failure to raise in the arbitration proceedings, they too lack merit, given Prime's description of the substantive basis for its claims in its summary adjudication opposition papers.

federal lawsuit[38] to support its argument private state law contract claims are not preempted: "It is the Secretary's view that Medicare Part C statutory and regulatory standards do not address whether [a Medicare Advantage organization's] course of conduct may establish an implied contract with its out-of-network providers as to payment rates." Resolution of that contract claim did not depend on applying Medicare Part C standards or any state law in an area governed by such standards. As the Secretary expressly observed, the plaintiffs neither contended it was the Medicare Act or federal regulations that entitled them to more than the original Medicare rate nor brought their claims under state laws purporting to regulate health plans; rather, the plaintiffs argued defendants had agreed to pay them at a rate above the original Medicare rate. The Secretary stated, "In short, where federal regulations do not establish a governing standard, there is no preemption."

As for the general presumption against preemption, as Division Two of this court stated in *Roberts, supra,* 2 Cal.App.5th at page 143, "the plain language of section 1395w-26(b)(3) [Medicare Part C's preemption clause] plainly spells out Congress's intent that the standards governing Medicare Advantage plans will displace '*any* State law or regulation' except for State laws regarding licensing or plan solvency." In addition, the legislative history of the 2003 Medicare Modernization Act demonstrates Congress's clear intent to broaden the scope of the preemption clause. Stating Medicare law at the time preempted

---

[38] The amicus curiae letter brief was filed on March 14, 2016 in the lawsuit *Ohio State Chiropractic Assn. v. Humana Health Plan Inc.*, United States Court of Appeals for the Sixth Circuit, Case No. 15-3130.

73

state law or regulation only "to the extent they are inconsistent with federal requirements imposed on M+C plans, and specifically, relating to benefit requirements, the inclusion or treatment of providers, and coverage determinations (including related appeals and grievance processes)," the Conference Report accompanying the bill explained Medicare Advantage standards "would supersede any state law or regulation" (with the exception of state licensure laws and state plan-solvency laws) with respect to Medicare Advantage plans offered by Medicare Advantage organizations. (H.R.Rep. No. 108-391, 1st Sess., pp. 1, 556 (2003).) The Conference Report continued, "The conference agreement clarifies that the [Medicare Advantage] program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases." (*Id*. at p. 557.)

CMS has also explained that, prior to the enactment of the 2003 Medicare Modernization Act, "[t]he presumption was that a State law was not preempted if it did not conflict with an M+C requirement, and did not fall into one of the four specified categories where preemption was presumed"; however, CMS "concluded that the [2003 Medicare Modernization Act] reversed this presumption and provided that State laws are presumed to be preempted unless they relate to licensure or solvency." (70 Fed.Reg. 4194, 4319 (Jan. 28, 2005).) CMS also referred to "Congress' intent that the [Medicare Advantage] program, as a Federal program, operate under Federal rules" and interpreted the Conference Report "as making clear . . . Congress' intent to broaden the scope of preemption." (*Ibid*.; see also 69 Fed.Reg. 46866 (Aug. 3, 2004) at p. 46880 ["Congressional intent is now

unambiguous in prohibiting States from exercising authority over [Medicare Advantage] plans in any area other than State licensing laws and State laws relating to plan solvency"] and pp. 46926-46927 ["In 2003, section 232(a) of the [2003 Medicare Modernization Act] . . . broadened Federal preemption of State standards to broadly apply preemption to all State law or regulation (other than State licensing laws or State laws relating to plan solvency)"; the 2003 Medicare Modernization Act "revision relieves uncertainty of which State laws are preempted by 'preempting the field' of State laws other than State laws on licensing and solvency"].)

With respect to Prime's reliance on *Yarick, supra,* 179 Cal.App.4th at pages 1165-1166, in which the Fifth District stated the language used in the Medicare Part C preemption clause is "usually . . . interpreted to preempt only 'positive state enactments,' that is, laws and administrative regulations, but not the common law," and *Cotton, supra,* 183 Cal.App.4th at pages 450-451, in which the Fourth District agreed with *Yarick,* to support its position the Medicare Part C preemption clause did not displace Prime's state common law remedies, we decline to follow those cases for the reasons articulated in *Roberts, supra,* 2 Cal.App.5th at pages 145-147: *Yarick*'s holding that Part C's preemption clause reaches only positively enacted state laws and regulations and *Cotton*'s holding that Part C's preemption clause only reaches laws specifically targeting Medicare Advantage plans are inconsistent with, and analyses rejected by, the Supreme Court in *Riegel v. Medtronic, Inc., supra,* 552 U.S. 312.

The *Roberts* court also discounted *Yarick*'s reliance on *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, finding that decision not "relevant" to the determination of the scope of

Medicare Advantage preemption. (*Roberts*, *supra*, 2 Cal.App.5th at pp. 145-146.) In *Sprietsma* the Supreme Court concluded the language of the Federal Boat Safety Act of 1971's express preemption clause (which provided in part, "[A] State . . . may not establish, continue in effect, or enforce a law or regulation establishing a recreational vehicle or associated equipment performance or other safety standard") "is most naturally read as not encompassing common-law claims." (See *Sprietsma*, at pp. 58-64.) Prime points out, although *Roberts* determined two of *Sprietsma's* three reasons for its holding did not apply to the Medicare Part C preemption clause (the use of the article "a" before "law or regulation" in the Boat Safety Act clause's language and the existence of a saving clause),[39] the *Roberts* court acknowledged the remaining basis for limiting the scope of preemption did apply: "the concern that the word 'regulation' 'might' be superfluous if the word 'law' were read broadly to reach *all* positive and common law enactments." (*Roberts*, at p. 146.) While *Roberts* concluded that concern regarding the potential for surplusage was "too thin a reed upon which to leave all common law actions intact when doing so . . . would disrupt the efficacy of [CMS's] preapproval of marketing materials and plan coverage"

---

[39] The Supreme Court explained, "[T]he article 'a' before 'law or regulation' implies a discreteness—which is embodied in statutes and regulations—that is not present in the common law." (*Sprietsma v. Mercury Marine*, *supra*, 537 U.S. at p. 63.) The saving clause provided, "Compliance with this chapter or standards, regulations, or orders prescribed under this chapter does not relieve a person from liability at common law or under State law." (46 U.S.C. § 4311.)

(*ibid*.), Prime contends *Roberts* is inapposite because the potential for interference with the efficacy of CMS's marketing-and-coverage preapproval is not present here.

Prime's attempt to distinguish *Roberts* misses the point. The *Roberts* court expressed concern about disrupting the efficacy of CMS's marketing-and-coverage preapproval process because, as it had earlier explained, the "Secretary closely regulates Medicare Advantage health plans" and Medicare Part C regulations include provisions that the Secretary, through CMS, "reviews each plan to ensure that it has a 'sufficient number and range of health care professionals and providers willing to provide services under the terms of the plan'" and "reviews all 'marketing material' used by Medicare Advantage plans prior to their use." (*Roberts*, *supra*, 2 Cal.App.5th at pp. 140-141.) Similarly, here, allowing Prime's state common law claims relating to its Medicare Advantage member services to proceed would interfere with the Secretary's close regulation of Medicare Advantage health plans by displacing or diluting through state common law principles the Medicare Part C standards that would otherwise have governed those claims. Moreover, as our colleagues in Division Two explained, the "canon of statutory construction that counsels against construing words as surplusage," albeit "a guide for ascertaining legislative intent," "is not a command," and "[w]here . . . that canon leads to a result at odds with the otherwise clearly expressed legislative intent, the canon necessarily yields to that intent." (*Id*. at p. 146.) The plain language of Medicare Part C's preemption clause, as well as its legislative history, clearly expresses Congress's intent that Medicare Part C standards preempt "any" state law or regulation (except for state licensing or plan-solvency laws) with respect to

77

Medicare Advantage plans. "*Sprietsma's* superfluity point," particularly given its "tentative nature" (*Uhm v. Humana, Inc.* (9th Circ. 2010) 620 F.3d 1134, 1154), must yield to that clearly expressed Congressional intent.

In its reply brief Prime argues Kaiser is mistaken in contending its state common law claims regarding services provided to Medicare Advantage members would involve "wading into the complex Medicare regulations governing [Medicare Advantage organization] denials and standards for determining whether emergen[cy] care was reimbursable under 42 C.F.R. § 422.113" because Kaiser "fought the [Department of Health and Human Services] and Prime on this issue, and it lost," as indicated in *Kaiser Foundation Health Plan, Inc. v. Burwell* (N.D.Cal. 2015) 147 F.Supp.3d 897 (*Burwell*). Stating the federal district court in *Burwell* "comprehensively analyzed the Medicare regulations and [the Department of Health and Human Services's] administrative interpretations of those rules" and held both that, "under 42 C.F.R. § 422.113," "'the physician "must decide" when the enrollee may be considered stabilized and that the determination is "binding on the [Medicare Advantage] organization,"'" Prime insists Kaiser "cannot reopen the 'stabilization' issue now" under principles of collateral estoppel. Putting aside whether Prime has forfeited this issue first raised in its reply brief, that Kaiser may be collaterally estopped from rearguing the stabilization issue decided on the merits based on Medicare Part C standards in *Burwell* does not place Prime's similar state common law claims outside the scope of Part C's express preemption clause, but rather firmly within it.

## DISPOSITION

The judgment is affirmed.  Kaiser is to recover its costs on appeal.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.